**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,**

v.

**E. I. duPONT de NEMOURS AND COMPANY, CHESTNUT RUN AND AFFILIATED FACILITIES, Defendant.**

Civ. A. No. 4515.

United States District Court,
D. Delaware.

Jan. 19, 1978.

Supplemental Opinion Jan. 25, 1978.

J. Lincoln Woodard, Vincent A. Fuller, and Carlton L. Preston, Equal Employment Opportunity Commission, Washington, D. C., for plaintiff.

James M. Tunnell, Jr., William H. Sudell, Jr., Thomas R. Hunt, Jr., and George Pazuniak, of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., R. Lawrence Ashe, Jr., of Kilpatrick, Cody, Rogers, McClatchey & Regenstein, Atlanta, Ga., John F. Lawless, Washington, D. C., E. I. duPont de Nemours & Co., for defendant.

## OPINION

STAPLETON, District Judge:

The Equal Employment Opportunity Commission ("the Government") brought this action against E. I. duPont de Nemours & Company ("DuPont"), pursuant to Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e et seq., to secure relief against allegedly discriminatory employment practices occurring at DuPont's Chestnut Run and Christina Laboratory sites. After four and one-half years of litigation and a trial of five weeks duration, the case is now ripe for a decision on the merits. This Opinion constitutes the Court's findings of fact and conclusions of law.

DuPont is engaged in research, development, manufacture and marketing of chemicals and chemical related products which it ships across state lines. Since July 2, 1965, the effective date of Title VII, DuPont has continuously been an employer engaged in an industry affecting commerce within the meaning of Section 701(b), (g) and (h) of Title VII, 42 U.S.C. § 2000e(b), (g) and (h), and has employed more than twenty-five persons. Accordingly, this Court has jurisdiction of the controversy pursuant to Section 706(f)(1) of Title VII, 42 U.S.C. § 2000e–5(f)(1).

A detailed account of the administrative proceedings leading up to the filing of this action on November 12, 1972 is set forth in

this Court's prior Opinion [1] and that account need not be repeated here. Suffice it to say that, based upon the facts there recorded, I have concluded that the prerequisites to suit by the Government under Title VII have been satisfied.

## I. THE FACTUAL CONTEXT.

While many of the facts are more appropriately discussed in the context of the various contentions of the parties, an overview of the character of the two sites, certain of DuPont's personnel practices, and the history of black participation in the work force are helpful at the outset.

### A. The Character Of The Two Sites.

Chestnut Run began operations in 1954 when the Textile Research Laboratory (TRL) of DuPont's Textile Fibers Department was transferred to the site. Over the next fourteen years, seven other laboratories were established at that location.[2] Each of these laboratories is an arm of a particular operating department within the DuPont Company and works with a given product line or group of products of the parent department. Their purpose is to provide testing facilities and product expertise to existing or potential customers for DuPont products. These laboratories assist customers in overcoming processing difficulties and also engage in the development of new products and new end-uses for existing products.

In order to be able to assist customers, each laboratory must be capable of duplicating the manufacturing processes of each customer in a particular line of industry. Thus, these laboratories contain hundreds of pieces of equipment like those used by industrial customers. At any given moment, however, relatively few of those pieces of equipment will be in use.

1. *EEOC v. E. I. DuPont de Nemours & Company,* 373 F.Supp. 1321 (D.Del.1974), *aff'd.,* 516 F.2d 1297 (3rd Cir. 1975).

2. Plastic Products & Resins (1954), Elastomers (1955), Film (1955), Freon Products (1955), Pigments (1958), Industrial Chemical Department (1962), and Photo Products (1969).

The Christina Laboratory was developed by the Textile Fibers Department in 1965 as a small lot manufacturing plant engaged in the development of new methods and processes for manufacturing new products. As a result, Christina Laboratory is in some respects a research facility engaged in refining the characteristics of products and developing new processing techniques and standards of manufacture. In the course of a product's development, processing procedures and techniques are modified on an almost daily basis.

Pending full development of the facility, all administrative services were to be provided by Chestnut Run personnel on assignment to Christina Laboratory. It was originally intended, however, that, in time, Christina Laboratory would become totally independent of Chestnut Run. Due to unfavorable economic turns, the separation of Christina Laboratory from Chestnut Run never occurred.

Because the Textile Fibers Department (i. e., its Textile Research Laboratory) was the first to arrive at the Chestnut Run location, it was assigned the "landlord function", which included the responsibility to provide all administrative services for itself and the other departmental laboratories that followed. Landlord responsibilities include such general services as safety, protection, transportation, maintenance, power, design and product engineering, purchasing, accounting, medical services, cafeteria, shipping and receiving of materials, plus clerical and secretarial services for the entire site. Another important landlord responsibility, especially in the context of this suit, is the maintenance of a personnel office to oversee recruitment, hiring, training and other personnel services relating to non-exempt employees attached to the departmental laboratories.[3] In addition, the Textile Fibers Department has responsibility for securing, by transfer, promotion or hire, exempt employees to administer the landlord function.

All employees at the two sites are assigned to particular "work units", i. e. functional groupings of related jobs or products. Each departmental laboratory, including Christina Laboratory, is a separate work unit. In addition, there are a number of administrative work units, including the Accounting, Protection, Service, Engineering, Control, Mechanical, Power and Personnel work units.

As of August 31, 1976, there were 1,234 non-exempt employees at Chestnut Run and Christina and 98 exempt employees engaged in the landlord function. The non-exempt work force falls into four broad occupational categories.

| Category | Employees | % of Total |
|---|---|---|
| Technical/Operations | 766 | 62.0% |
| Secretarial/Clerical | 237 | 19.2% |
| Craftsmen/Maintenance | 186 | 15.1% |
| Service/Protection | 45 | 3.6% |

Out of this total non-exempt work force, only approximately 100 employees are in what can be categorized as low-skilled positions, i. e. mail clerk, driver, etc. The remaining jobs all require various types and levels of skills.

Combined peak employment at the two sites was reached in 1969, although Christina Laboratory continued to develop until 1974. Since that time, however, economic circumstances have required curtailment of operations, with concurrent reductions of force.

### B. *Certain Of DuPont's Personnel Policies.*

Non-exempt jobs on the sites are classified by compensation level. These jobs are also classified as being at, below or above "career level". A career level job is the highest level job within a particular job family or "progression" that most employees are reasonably expected to reach during their working careers. In the laboratory work units, for example, the laboratory technician job, which was a level 8, was considered the career level job. On the

---

**3.** The classification of employees as "exempt" or "non-exempt" is derived from the Fair Labor Standards Act. 29 U.S.C. § 213(a).

discovery cut-off date, August 31, 1976, the average laboratory technician received approximately $13,000 per year. (PX–56). Testing technicians were level 6, and thus below career level. Technical assistants were level 10, and thus above career level.

Throughout the period from 1955 to the present, the passing of a test has been required as a prerequisite to employment in laboratory technician and testing technician jobs, as well as all clerical and office jobs.[4] These positions constituted the bulk of non-exempt jobs available at the sites.

Prior to 1969, no testing was required as a prerequisite to being hired into the relatively few processing technician jobs. During this period, people were hired into these jobs on the basis of prior experience in the performance of various textile operations. In 1969, a processing technician's test was instituted and a substantial number of processing technicians were hired on the Christina site in the period from 1972 to 1974.

From the opening of Chestnut Run until 1964, there was no testing of applicants for craftsman positions. During that period, DuPont hired only journeyman craftsmen who had completed an apprenticeship in their respective crafts. In 1964 a test was instituted in order to permit people with prior industrial training and experience to demonstrate that they had knowledge and skills equivalent to those of a journeyman craftsman, but defendant continued to hire only skilled people as craftsmen until 1972. In that year a mechanic's training program was instituted, admission to which required the passing of an aptitude test but no prior training or skills.

The last substantial job category, that of the Service work unit, has never had an entry test.

From the beginning, there have been job transfer and seniority systems on the sites. Between 1960 and 1972, under the job transfer system, any non-exempt employee in the Service or Administration work units could file a job transfer request indicating a desire to transfer to a specified type of job, at or below career level, in the laboratory work units. Non-exempts in a lab unit could request transfer to Service and Administrative work units, but not to another lab unit. After 1972, any non-exempt could apply for transfer to a job at or below career level in any other work unit on the site including the lab units. If a non-exempt passed whatever qualifying test was required for the job he sought, he would be placed on the job transfer list based upon his company seniority and the company seniority of the other test qualified employees who had requested transfer to that type of job.

Under the seniority system, when an opening occurred, the job was first offered to anyone who had previously been regressed from that job as a result of a reduction in force. If there was no one with "vested rights" by reason of a prior regression, the job was then offered to the employees in the work unit involved, in the order of their *work unit* seniority. If not filled in this manner, the company went to the job transfer list and offers were made in accordance with *company* seniority. Only if these three steps produced no willing candidate, did the company "go to the gate" and hire a new employee.

Under the seniority system, when it became necessary to lay off employees, the most junior employee on the site in terms of *company* service was the first to go. Thus, while *work unit* seniority played a roll in promotions and regressions,[5] it played no part in any layoff decision.

Hiring and promotion decisions with respect to above career level jobs and exempt positions were not the responsibility of the personnel office. They were made by work

---

4. The tests included the Laboratory Technician test, the Testing Technician test, and the Clerical Aptitude test. Those seeking typist and stenographer positions also took a typing test, and, in the case of stenographers, a shorthand and transcription test.

5. Regressions generally did not affect compensation level.

unit and site management.[6] Length of service, except to the extent it was reflected in skills, knowledge, and ability to train, etc., was not the determining factor in these decisions.

### C. *History Of Black Participation In The Work Force.*

Prior to 1960, the unwritten policy at Chestnut Run was to maintain "white jobs" and "black jobs". Blacks were hired only into the Service Unit to perform unskilled labor such as janitorial services, building and grounds maintenance, etc. All other jobs were reserved for whites.

In the Spring of 1957, Dr. Russell W. Peterson, who then had the responsibility for the development of the Chestnut Run site instructed Harwood Strange, the site's Personnel Superintendent, to form a committee "on a confidential basis" to propose a strategy for providing wider employment opportunities for blacks. Little tangible progress was made, however, until June of 1960 when Strange, as a result of contacts with an administrator at the predominantly black Walnut Street YMCA, placed a black stenographer in the Textile Research Lab.

In 1960, management instructed the personnel office that blacks were to be considered on an equal basis with whites as candidates for all jobs at the site. Not surprisingly, however, this did not result in an immediate increase in black participation in previously white jobs. The message conveyed to black employees and the black community by years of employment discrimination was not to be eradicated by a change of official policy alone.

In 1959 or 1960, efforts were begun to find black candidates in the Service work unit for promotion to lab tech jobs. These initial efforts can accurately be described as narrow in scope. All of the personnel files of the 60 to 70 Miscellaneous Services Operators ("MSO") were reviewed by a first line (immediate) supervisor in an effort to select those most likely to be able to pass the lab tech test. Three black employees were selected by supervision and tutored in math and other subjects related to the demands of the lab tech test. However, none of these three employees passed the test.

It was not until the Plans for Progress Program was established as a result of President Kennedy's Executive Order 10925, signed in the Summer of 1961, which required government contractors to offer equal employment opportunities, that Du-Pont developed a program for getting the equal employment opportunity message across to its MSO's and the black community as a whole. In the Summer of 1961, management formulated a set of procedures designed to "communicate its EEO policy to the lowest levels of employment",[7] and it is clear that the desire of site management to bring this message home was communicated to the supervision of all work units. It is equally clear that the objective of the program was not fully accomplished at this stage.

In October of 1961, Samuel Holland, an MSO, passed the Lab Tech test and was assigned to a Lab Tech job in the Plastic Lab. This fact was announced to each working group in the Service work unit.

In September of 1963, supervision reviewed the procedures and qualifications necessary for transfer to the other jobs available on site with each MSO employed as of September 1 of that year. A check-off roster of MSO's was used to assure complete coverage.[8] Skepticism remained nevertheless. A rumor was circulating about this time in the Service work unit, for example, that there were two tests, one for whites and one for blacks.

In November of 1963, all MSO's were offered the opportunity to take a Beta Intelligence test which had been secured from a local high school. It was designed to examine non-verbal reasoning and it was hoped that the test might identify potential

---

**6.** In the case of some high level exempt positions, decisions were participated in by off-site supervisors of the site manager.

**7.** DX–8.

**8.** DX–89.

candidates for coaching on a more objective basis. Sixty-three MSO's took the test. Coaching of interested MSO's by first line supervision continued thereafter.

There was another procedure used during the 1960 to 1965 period which was designed to inform employees of the opportunities for job advancement. The established policy was that the various types of jobs available on the site and the job transfer system would be explained to each new employee by his first line supervisor, as a part of his orientation, during the first two weeks of his employment. The orientation check-off sheets listed this as a subject required to be covered and these sheets were filled out and returned to third line supervision and ultimately to the personnel office. This procedure was reasonably designed to accomplish the desired end. Its practical effectiveness, however, depended, of course, on the attitude and commitment of individual first line supervisors. I believe that not all blacks hired to the Service work unit after 1960 were informed of the opportunities for advancement. On the other hand, the record suggests that the effectiveness of this procedure improved during the 1960 to 1965 period as management reaffirmed its commitment to equal opportunity and as tangible evidence of that policy began to appear on the sites.

By 1965, at least 25 of the black MSO's had filed job transfer requests and had taken the required tests, some of them on a number of occasions. Seven black service workers had been transferred to previously all white jobs at that time.[9] It is a fair inference from these facts and the other evidence of management's efforts to get the message across, that an MSO who did not know of the job transfer system and the availability to him of testing in June of 1965 was the rare exception, rather than the rule.

Besides these internal efforts, there were efforts during the 1960–65 period to bring the equal opportunity message to outsiders.

After a somewhat belated start, a substantial campaign was mounted from 1963 to 1965, to recruit black applicants. Openings for lab techs, craftsmen, stenographers, typists and mail clerks were advertised in black newspapers. All hiring ads after 1963 carried the equal opportunity employer notation. Schools and employment agencies were advised by individual letters of the desire for minority applicants. Local schools were visited and guidance counselors, as well as leaders of the black community, were invited to visit the sites to learn of the job opportunities available. It is difficult to find fault with these efforts.

While complete records are not available, the evidence does show that by July 2, 1965, the effective date of Title VII, at least 23 blacks had been hired or promoted into jobs in work units other than the Service work unit.[10] Nevertheless, on that date blacks constituted approximately 1.2% of the non-exempt, non-Service work unit labor force and approximately 1.4% of the exempt work force.[11]

After the effective date of Title VII, efforts to increase black employment beyond the MSO ranks continued. In 1966 a new Services Superintendent met with the MSO's and reviewed the opportunities and requirements for promotion or transfer to various positions. The tutoring program continued.

During the latter part of 1965 and again in May of 1966, presentations were made at meetings of all service workers which reviewed the openings available for stenographers, typists, mechanics and technicians and requested that the employees speak with friends and neighbors about these openings.

By 1968, it was concluded that the potential of the tutoring program for MSO's had been exhausted and a program, later to become known as the "Thirteen Minus Two Program", was instituted in the Summer of that year. This was an on the job training program in the Textile Research Lab.

9. DX–68, DX–8.

10. DX–86.

11. DX–100.

Thirteen participants were selected from the Service work unit solely on the basis of length of company service and willingness to participate. The participants were assigned to jobs in TRL. In addition to training by supervision in performing their assigned tasks, they participated in bi-weekly training sessions in mathematics and simple geometric and algebraic principles. The goal of the program was for the participants to achieve competence over a five year period in 50% of the tasks ordinarily performed by test qualified lab technicians. Those who achieved such competence were to become laboratory technicians. Participants could qualify at any time by passing the lab tech test.

Two additional programs resulted from a compliance review by the Atomic Energy Commission's Contract Compliance Office in 1972[12]: a job preference survey and a mechanics trainee program. In July of 1972, a questionnaire was given to all black and female employees on the sites who were below career level. They were asked to indicate any jobs on the sites in which they had an interest and to state any reasons why they did not wish to be considered for transfer or promotion. Where interest in a job was expressed, the employee was asked to file a job transfer request and to take any necessary test.

While DuPont had succeeded in hiring one black electrician in 1965, its inability to locate skilled black mechanics continued in the post-Act period. In an effort to alleviate this problem, a maintenance trainee program was established in 1972 which offered on the job training to people who passed an aptitude test. MSO's were contacted in order of company service to determine interest in this program.

DuPont's efforts to encourage upward mobility for its MSO's has met with significant success. Of the 98 employees who were hired as MSO's prior to July 2, 1965 and who remained on roll as of that date, 50 had obtained non-exempt jobs at level 6 or

above or exempt jobs by 1975. Seven members of this group (7.1%) had obtained exempt jobs. Five of the seven were in work units other than the Service work unit.[13]

The equal employment message was also effectively communicated to the black community. DuPont's applicant flow logs for the years 1972 to 1976 show that 22.6% of all job applicants during that period were black.[14]

While there are a number of specific jobs at the two sites which have never been held by a black, with one exception, there is no work unit on either site which has not had a black employee. The sole exception is the engineering work unit which employs only two people.

The racial composition of defendant's non-exempt work force on August 31, 1976 was as follows:

Chestnut Run & Christina Laboratory

Non-Exempt Workforce by Job and Race as of 8–31–76

| Jobs | Total Employees | Blacks | Percent Black |
|---|---|---|---|
| Technical Positions (Sr.) | 114 | 0 | 0% |
| Laboratory Technicians | 402 | 26 | 6.5% |
| Process & Testing Tech. | 133 | 33 | 24.8% |
| Mechanic Positions | 153 | 7 | 4.6% |
| Clerical Positions (Level 6 and above) | 195 | 15 | 7.7% |
| Clerical Positions (Level 4 & 5) | 29 | 6 | 20.7% |
| Clerical Positions (Level 2 & 3) | 11 | 1 | 9.1% |
| Garage Mechanic | 1 | 1 | 100% |
| Service Driver | 29 | 26 | 89.7% |
| Utility Operator-Prod. | 26 | 9 | 34.6% |
| All other positions | 141 | 29 | 20.6% |
| Source: PX 54 Total | 1,234 | 153 | 12.4% |

In summary, DuPont maintained a segregated work force prior to 1960. In initiated planning for desegregation in 1957, but on a "move slowly" basis. In 1960, its policy changed to one of equal employment opportunity. Its initial effort to implement this policy was limited primarily, however, to the placement of a few "hand picked" blacks in previously all white jobs. Prodded by the Executive Order 10925, requiring government contractors to offer equal employment opportunity, and the Plans for

---

12. The first such compliance review had taken place in 1964.

13. DX–70.

14. DX–13a.

Progress implementation of that Order in the early 60's, plans were developed to effectively communicate the equal employment policy to black employees and the black community. By the effective date of Title VII in 1965, defendant had effectively communicated this change of policy and was actively encouraging greater black participation in previously all white jobs. During the post-Act period, continued encouragement of existing employees, on the job training programs, and increased black employment applications resulted in substantial black participation in those positions.

## II. THE SUBSTANTIVE STANDARDS, AND THE BURDENS OF PRODUCTION AND PERSUASION.

The Government claims that various employment practices of DuPont at these two sites have a disparate impact on blacks which is not justified by any legitimate considerations relating to the business there transacted. It has offered extensive statistical data in support of its claims as well as the testimony of eight DuPont employees which is intended to "bolster" the statistical evidence by demonstrating the effect of the challenged policies and procedure as actually practiced. DuPont has countered with statistical data of its own and with testimony from its managerial personnel describing the nature of the business conducted, the jobs available at the sites, and the way in which its personnel policies have been established and carried out. The legal principles to be applied in analyzing a record of this kind are relatively well established.

Section 703(a) of the Act, 42 U.S.C. § 2000e–2(a), defines an unlawful employment practice as follows:

> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
>
> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend

to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

■ The objective of Title VII is the elimination of discrimination in employment. As the Supreme Court observed in *Griggs v. Duke Power Co.*, 401 U.S. 424, 429–31, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971):

> The objective of Congress in the enactment of Title VII is plain from the language of the statute. It was to achieve equality of employment opportunities and remove barriers that have operated in the past to favor an identifiable group of white employees over other employees.

> \*　　\*　　\*　　\*　　\*　　\*

> Congress did not intend by Title VII, however, to guarantee a job to every person regardless of qualifications. In short, the Act does not command that any person be hired simply because he was formerly the subject of discrimination, or because he is a member of a minority group. Discriminatory preference for any group, minority or majority, is precisely and only what Congress has proscribed.

*See also Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977).

■ The plaintiff in a case of this character can establish a *prima facie* case with statistical evidence showing a significant disparity between the black population in the defendant's work force, or any relevant portion thereof, and the black population of the labor pool from which that work force, or relevant portion thereof, comes. *Hazelwood School District v. United States*, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977). Other evidence may be submitted tending to support the inference of disparate impact suggested by the statistical data. If the plaintiff makes out a *prima facie* case, the defendant then has the burden of coming forward with evidence which tends to negate the inference of disparate

impact, to explain any such impact by legitimate job related considerations or to show that the plaintiff's statistics are a product of pre-Act policies only *Hazelwood School District v. United States, supra.* If such evidence is introduced, the relevant inquiry for the Court is whether, considering all the evidence, the plaintiff has proved by a preponderance of the evidence that the challenged practices have a disparate impact which is not dictated by the legitimate needs of the employer.

■ If it appears that any disparate impact is justified by the nature of the employer's business, the plaintiff may nevertheless prevail if the preponderance of evidence indicates that policies and practices having a lesser adverse impact on blacks would serve the employer's legitimate interests substantially as well.[15] With one exception,[16] the presence or absence of discriminatory intent is not relevant to the liability issues posed by a case of this character.

### III. MATTERS NOT IN ISSUE.

Before addressing the issues for resolution by this Court, it is important to understand that there are several key areas in which there is no dispute between the parties.

With the exceptions heretofore noted, all of the non-exempt jobs at the two sites have required qualification by test throughout the post-Act period. In addition, there has been testing in connection with promotions to some exempt positions. The Government in its original and restated complaint challenged these tests as having an unjustified disparate impact upon blacks. After examining the materials produced in discovery and the documentary exhibits prepared by DuPont for use at trial, however, the Government stipulated that all of these tests had been validated in accordance with the EEOC Guidelines, 29 C.F.R. § 1607, *et seq.,* and are in compliance with Title VII. Moreover, the Government, with two exceptions, concedes that defendant's *use* of these validated tests is in accordance with Title VII. It does maintain, however, that blacks were not given equal access to testing and that the Thirteen Minus Two Program does not have as great an adverse impact on blacks as DuPont's Laboratory Technician test and "would also serve its 'legitimate interest in efficient and trustworthy workmanship' ".

The second area which is not the subject of dispute is the area of discrimination in recruitment. The Government pointed out at the end of its case that it did not contend that DuPont had discriminated in the recruitment of applicants for non-exempt employment and there is no evidence to suggest that it has.[17] To the contrary, the record shows substantial special efforts by DuPont in the post-Act period, as well as before, to recruit black employees for non-exempt jobs and its applicant flow log shows that, from 1972 to 1976, 22.6% of all applicants were black. (DX–13a). The highest figure which the Government has suggested for the black population of the appropriate labor pool is 16.9%.

Finally, the Government concedes that the data relating to the period from 1972 to 1976 does not suggest discrimination in *overall hiring* by DuPont. Plaintiff's Exhibit 85, for example, shows that of the 515 people hired during this period 21.9% were

---

**15.** *Dothard v. Rawlinson,* 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977); *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *Robinson v. Lorillard Corp.,* 444 F.2d 791 (4th Cir.), *cert. dismissed,* 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971); *Head v. Timkin Roller Bearing Co.,* 486 F.2d 870 (6th Cir. 1973); *Rodriguez v. East Texas Motor Freight System, Inc.,* 505 F.2d 40 (5th Cir. 1974), *rehearing denied,* 518 F.2d 1407 (1975), *vacated and remanded on other grounds,* 431 U.S. 395, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977).

**16.** *See* Section VI(A)1, *infra.*

**17.** (H–23–24). Likewise I do not understand the Government to contend that it has shown discrimination in DuPont's recruitment for exempt employment and there is no substantial evidence in the record to support such a contention.

black.[18] The Government does strenuously assert, however, that there was discrimination in *overall hiring* during the period from 1965 to 1969, and that there was discrimination in *initial job assignment* throughout the entire post-Act period.

## IV. GENERAL PATTERNS AFFECTING EVALUATION OF THE STATISTICAL EVIDENCE.

■ The Government relies in part on statistical data showing the racial composition of DuPont's work force at various points in time after July 2, 1965. As earlier noted, such data, together with evidence of the racial composition of an appropriate labor pool, can establish a *prima facie* case.[19] The Government's work force statistics, however, reflect pre-Act hirings, promotions and other personnel decisions as well as post-Act ones. This is of great significance in a case of this kind where the evidence shows that an employer practiced discrimination in the pre-Act period. While evidence of pre-Act discrimination may be relevant and helpful in understanding what has happened after July 2, 1965, liability cannot be predicated on pre-Act practices. *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). As the Supreme Court noted in the *Hazelwood* case:

> [an] . . . employer who from . . . [the effective] date forward made all of its employment decisions in a wholly nondiscriminatory way would not violate Title VII even if it had formerly

maintained an all-white work force by purposefully excluding Negroes. For this reason, the Court cautioned in the *Teamsters* opinion that once a prima facie case has been established by statistical work force disparities, the employer must be given an opportunity to show "that the claimed discriminatory pattern is a product of pre-Act hiring rather than unlawful post-Act discrimination".

433 U.S. at 309, 97 S.Ct. at 2742.

As earlier noted, DuPont began the post-Act period with a highly segregated work force and the statistical data evidencing the black population in DuPont's work force and various segments thereof at given points in time during the post-Act period must be evaluated with the recognition that racially neutral post-Act employment practices would not immediately produce a black work force at parity with the black population of the available labor pool. In this connection, it is also important to recognize several facts relating to the stability of DuPont's work force at Chestnut Run and the Christina Laboratory. Of those on roll in the relevant work force on August 31, 1976, 55.1% were on roll before July 2, 1965. The relatively low turn over figures which in part are responsible for this statistic show a somewhat higher separation rate for black employees than for whites.[20] Also, as one would expect, there was greater stability in the post-Act period among those with the more skilled, higher paying jobs.[21]

**18.** 7.77% of all white applicants and 8.15% of all black applicants were hired during this period. (PX-85). DuPont's figures, including additional 1976 data, show that 22.6% of hires from 1972–1976 were black.

**19.** Just how appropriate the labor pool data must be has not been decided by the Supreme Court. *Compare Hazelwood, supra (prima facie* case present in action challenging hiring practices of a particular school district when data relating to racial composition of teachers in surrounding public schools introduced) with *Mayor of City of Philadelphia v. Educational Equality League,* 415 U.S. 605, 94 S.Ct. 1323, 39 L.Ed.2d 630 (1974) (*prima facie* case not present in actions challenging selection of

members of municipal panel where only comparative data was racial composition of city).

**20.** For the period January 1, 1972 to August 31, 1976, there was an average annual separation rate of 3.59% for white employees and 7.61% for black employees.

**21.** For example, of the above career level roll incumbents as of December 30, 1976 (e. g., Technical Assistant, Senior Research Assistant, etc.) 98.5% had more than ten years service and 83.7% had more than fifteen years service. Of the above career level A roll incumbents as of that date (e. g., Secretary A–C, Intermediate Clerk A–B, Senior Clerk, etc.) 80.8% had more than ten years service and 47.7% more than fifteen years service. DX–22A; B.

The highly segregated character of Du-Pont's work force on the effective date of the Act is also a relevant consideration in evaluating the data relied upon by the Government in support of its claim of discrimination in promotions to above career level and exempt positions. Candidates for above career level and supervisory positions come largely from the ranks of those having substantial experience in career level jobs. Accordingly, it is to be expected that racially neutral promotion procedures would not significantly increase black representation in these higher positions until sometime after significant black participation at the career job level is reached.

█ While the Government stresses hiring and work force population statistics during the period from 1965 to 1969, Du-Pont puts major emphasis on statistical data showing the racial composition of its work force on August 31, 1976, and on the number of blacks hired and promoted over the entire decade from 1966 to 1975. This is undoubtedly because the hiring and promotion statistics for the period from 1970 to 1975 are somewhat more favorable to Du-Pont than are those relating to the 1965 to 1969 period.[22] While DuPont's performance during the later period is, of course, relevant, it cannot serve as a complete response to the Government's claims regarding the earlier period. If the record shows that DuPont's personnel practices during the 1965–1969 period had an unjustified disparate impact upon blacks, the Government has established liability regardless of DuPont's subsequent performance.

█ Finally, one further comment is in order regarding the statistical data. The parties recognize, as they must after the *Hazelwood* case, that absent evidence of discriminatory recruitment, the most significant statistical data relevant to the question of the available labor pool is applicant flow data. DuPont currently has applicant flow data by race for the period from 1972 to 1976. It does not, however, have such data for any year prior to 1972. The parties agree that it is, therefore, necessary to look to other data sources for the relevant pool in the earlier years, but the Government maintains that the Court should draw an inference from DuPont's failure to produce earlier applicant flow data by race that, if available, it would show disparate impact upon blacks in the area of hiring. I decline to draw such an inference. Both the trial testimony and contemporary documentation show that DuPont first started keeping applicant flow data by race in May of 1972 as a result of a suggestion from the Atomic Energy Commission's Contract Compliance Office.[23] The failure to maintain an applicant flow log indicating race prior to that time was attributable to an understanding that an employer was not supposed to keep applicant records by race.[24]

---

**22.** The Government suggests that this is attributable to the difference in the available jobs during these periods. During the three year period from 1967 to 1969, the Government notes, 42.8% of all those hired were hired into level 8, lab technician jobs, while during the three-year period 1972 to 1974, 58.6% of all those hired were hired as level 3, Utility Operators-Production, at Christina Laboratory. The Government draws the inference that DuPont's better showing in black hires during the latter period is attributable to a greater willingness on DuPont's part to hire blacks into lower level jobs than into higher level ones. I conclude, however, that the greater percentage of blacks hired as utility operators reflects a larger black participation in the pool qualified for those positions.

**23.** DX–10; Strange 0–150–1.

**24.** Strange 0–150–1. The applicant flow "log" instituted in May of 1972 included information on whether each applicant was tested or not tested and whether the test was passed. Similarly, I draw no inference adverse to the employer from its failure to retain all test results prior to 1972. (See Antonio J–99–100, K–55; Strange 0–70–1). Clearly the limited allegations of the Parker charge gave no cause to suspect that testing data would be relevant to its resolution. See 373 F.Supp. at 1323. The Government's findings which revealed its view of the relevant issues was not handed down until February of 1972. This suit was not instituted until November of 1972.

## V. HIRING AND INITIAL ASSIGNMENT.

### A. *Non-Exempts.*

#### 1. *The appropriate labor market.*

The initial issue to be determined in connection with the charge that DuPont has discriminated against blacks in the hiring and job assignment of non-exempts is the relevant labor market area. The Government argues for a market defined by its expert, Dr. Haber, after a pre-trial study of the distribution of the residences of those employed at the two sites. The black population in this market, according to census figures is 16.9%.[25] DuPont, on the other hand, urges the Court to select the work force of the Wilmington Standard Metropolitan Statistical Area ("Wilmington SMSA") as the appropriate labor market. The black population of the employed labor force in this area is 11.2%.

Dr. Haber, a labor economist, analyzed data supplied by DuPont which identified the residence at the time of hire of all individuals employed at the two sites in non-exempt jobs as of March 1973. He determined that greater than 85% of all employees resided within a fifteen mile radius of each site, and that over 95% resided within a thirty mile radius of each site. He then drew 360 degree concentric circles around each site at distances of 5 miles, 10 miles, 15 miles, and 30 miles, respectively. After ascertaining from census tract data the work force population of each area thus defined, he weighted the population of each area in proportion to the number of DuPont employees residing in that area. The result of this weighing process was the conclusion that 16.9% of the total population in the relevant market was black.

There are several problems with Dr. Haber's approach. First, his 16.9% relates to total *population* in the market area. Dr. Haber made no effort to isolate the *labor force.* His population thus included people above and below the working age, those in colleges, prisons, mental hospitals, other long term health facilities, and so forth (Francese J–10–11; Haber B–81). The labor force is substantially smaller than the total population. Dr. Haber's figures, for example, show that the labor force in the State of Delaware is only approximately 40% of the total population. On cross-examination he acknowledged that one would expect the percentage of blacks in the total population to exceed that in the labor force. While Dr. Haber's report suggests that there is a correlation between black representation in the total population and black representation in a population of employed persons with less than four years of college and that, therefore, the total population is a meaningful standard in the context of non-exempt jobs, I am unpersuaded by his analysis.[26]

More importantly, while Dr. Haber's approach takes recognition of the total distance by air between the residences of those employed at the two sites and their jobs, it did not involve any analysis of actual commuting patterns which are a function of time, cost, and intervening employment opportunities. (Siskin T–32–36, 44–47, Q–33–35; Haber C–74–76). The concentric circle approach, however, makes a very basic assumption about these matters. While it incorporates a consideration relating to employee distance from work, it in effect substitutes a geometric figure for an analysis based on the social and economic integration of the areas surrounding the employer. This necessarily injects an arbitrary factor which makes the analysis a less than satis-

---

**25.** The original position of the Government in its findings of probable cause was that the applicable hiring area is the City of Wilmington. Neither site is in the City of Wilmington and the Commission has since abandoned this contention.

**26.** The sole support for this suggestion is a table of 1970 census figures for the State of Delaware. While these figures do tend to show some correlation, no explanation has been offered which indicates to me that one can generally expect the racial composition of the total population to reflect the racial composition of the labor force with less than four years of college.

factory guide. This factor is illustrated by the fact that Dr. Haber's 30 mile circle includes large parts of Philadelphia and Camden while the basic data shows only one DuPont hire from Philadelphia and none from Camden. (PX–1). While the effect of including these areas is substantially reduced by Dr. Haber's weighting process, it appears to the Court that the black population of these areas is nevertheless given undue weight. For example, even after weighting, Pennsylvania accounted for over 21% of the labor market for Christina Laboratory, while only 7.2% of those at the site resided in Pennsylvania at the time of hire.[27]

Finally, there is a pragmatic problem with adopting the Government's approach. It is apparent from the record and from the Court's on-site inspection that not all people in the labor force have the necessary skills and knowledge to perform the majority of defendant's non-exempt jobs.[28] It thus becomes relevant to try to isolate those in the relevant area with the requisite skills. The census tract data with which Dr. Haber worked was not sufficiently detailed to enable him to "break out" those with particular skills. He had no idea, for example, how many of the blacks included in his 16.9% were qualified to be electricians or mechanics. (Haber T–82–83). For this reason, the Government's suggestion with respect to market area is not a helpful one.

DuPont, in addition to criticizing Dr. Haber's methodology, exhibits some understandable frustration with what it perceives to be conflicting positions on the part of the Government. The EEOC's "Affirmative Action and Equal Employment, a Guidebook for Employers" (DX–73) advises employers that:

> Your labor area should generally be the Standard Metropolitan Statistical Area (SMSA) for which the Census Bureau and other employment data is available.

In addition, the work force data cited by the Atomic Energy Commission's Office of Compliance in investigating and working with DuPont to develop an affirmative action program was apparently Wilmington SMSA data.

While DuPont acknowledges that the Government has not committed itself to the position that SMSA data is the most appropriate for all employers in all situations, it nevertheless suggests that, given the Government's position, SMSA data should be acceptable to the Government unless there are factors suggesting it is an unreliable indicator of a particular employer's available labor pool. While this contention has equitable appeal, it is unnecessary to pass upon it in this case. The record convinces me that, of the data available, the Wilmington SMSA census data provides the most reliable indication of the labor pool available to these two sites.

SMSA's are established by the Office of Management and Budget, with the assistance of the Bureau of the Census, as reflections of established areas of social and economic integration primarily on the basis of existing commuting patterns. *United States v. Connecticut National Bank*, 418 U.S. 656, 670, 94 S.Ct. 2788, 41 L.Ed.2d 1016 (1974). (Francese J–4–9). While they are undoubtedly imperfect indicators of human behavior, they are an attempt to apply the criteria that are of particular relevance in Title VII cases, and the Bureau of the Census has collected empirical data suggesting that this attempt is relatively successful. In the Philadelphia SMSA, for example, it has been ascertained that only 5% of the workers leave the SMSA to work. (Francese J–7–8). For these reasons, courts have frequently used SMSA data in Title VII cases to determine the appropriate labor pool. *See, e. g., Thompson v. McDonnell Douglas Corp.*, 416 F.Supp. 972, 980 (E.D. Mo.1976), *aff'd.* 552 F.2d 220 (8th Cir. 1977); *Louis v. Pennsylvania Industrial Dev.*

---

**27.** PX–76 Appendix p. 1, and mathematical analysis submitted at oral argument.

**28.** Dr. Haber was apparently asked to assume in making his analysis that all labor force members could perform defendant's non-exempt jobs. There is no record basis for this assumption.

*Auth.*, 371 F.Supp. 877 (E.D.Pa.1974), *aff'd.* 505 F.2d 730 (3rd Cir. 1974), *cert. denied* 420 U.S. 993, 95 S.Ct. 1430, 43 L.Ed.2d 674 (1975); *Patterson v. American Tobacco Co.*, 535 F.2d 257 (4th Cir.), *cert. denied* 429 U.S. 920, 97 S.Ct. 314, 50 L.Ed.2d 286 (1976).

■ Beyond this authority vouching for the general reliability of SMSA data for this purpose, the record indicates that it is an appropriate measure for these two sites. Neither site is on the periphery of the SMSA. While it is true that they are not located at the geographic center of the SMSA, they do lie at or near its social and economic focal point, the City of Wilmington. (Francese J–4). Moreover, based on the applicant flow log, we know that between 1972 and 1976, just over 90% of the applicants and hires resided in the Wilmington SMSA. Dr. Haber indicated that whenever one could locate the area from which 85 to 90% of the applicants or hires come, it is a good measure of the geographic hiring area. (C–105).

Nor am I persuaded that in this instance an SMSA approach gives undue emphasis to relatively remote areas of the SMSA and too little weight to the black population of Wilmington which is relatively close by. The record indicates that the jobs at Chestnut Run and Christina Lab were well paid, desirable ones for which people who do not have more accessible, comparable opportunities would be willing to commute substantial distances. (Haber D–58–60; Siskin T–32–35, 44–45).

The black population of the Wilmington SMSA in 1970 was 12.2%. The black work force in the SMSA at that time was 11.2%. The Government correctly points out that this latter pool does not include those who have been unemployed but seeking work during the relevant period and that this group may have a disproportionate percentage of blacks. For this reason, the 11.2% figure may be somewhat low, particularly in the context of the mid-70's. It is the best figure in the record, however, and, given DuPont's overall hiring statistics, it is unnecessary to find more than that the available labor force in 1970 was in the neighborhood of 11.2%.[29]

## 2. *The overall hiring of non-exempts.*

Of all new hires at the two sites between 1966 and 1975, 17.5% were black. (DX–14). While it is true that the relatively large number of black hires during the 1972 to 1975 period makes this an unreliable indication of the experience of blacks during the 1966 to 1969 period, a yearly breakdown of the racial composition of new hires shows that 15.5% of all hires during the four years from 1966 to 1969 were black. (DX–14). The percentage of new hires thus substantially exceeded the percentage of blacks in the available labor pool, without taking into account job qualification. These figures demonstrate that DuPont's personnel procedures in the post-Act period have not had a disparate impact upon blacks in terms of overall hiring.[30] The Government's case with respect to new hires thus turns on whether those procedures discriminated with respect to initial job assignment.

## 3. *Initial job assignment.*

■ The statistical data relied upon by the Government in support of its claim of discrimination in initial job assignment is summarized in the following table which

---

**29.** The Government does not contend that the SMSA figures for employed craftsmen and other categories of skilled workers are inaccurate indicia of the available labor force having those skills so that the difference between employed labor and available labor is not of significance in dealing with this more refined data.

**30.** These figures also demonstrate that DuPont's practice of asking for prior arrest data on applications prior to 1973 and for conviction data throughout the post-Act period did not have a disparate impact upon blacks in the area of hiring. No evidence suggests that these practices affected job assignment once a decision had been made to hire. All of the evidence to which the Government points in support of its challenge to these practices suggests, at best, that the information thus acquired was considered in decisions whether or not to hire.

shows the total number of employees hired into various categories of jobs during the period from 1960–1971 and the percentage of those assigned who were black.

NON–EXEMPTS
INITIAL ASSIGNMENT UPON HIRE BY RACE AND JOB
1960–1971 [31]

| Job | 1960–1964 | | | 1965 | | | 1966 | | | 1967 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Tot. | Blk. | % | Tot. | Blk. | % | Tot. | Blk. | % | Tot. | Blk. | % |
| Lab Tech | 128 | 0 | 0% | 129 | 3 | 2.3% | 83 | 1 | 1.2% | 73 | 3 | 4.1% |
| Test & Proc Tech | 58 | 3 | 5.2% | 36 | 1 | 2.8% | 25 | 0 | 0 | 20 | 1 | 5.0% |
| Mechanic | 13 | 0 | 0% | 25 | 1 | 4.0% | 18 | 0 | 0% | 4 | 0 | 0% |
| Clerical (2, 3) | 104 | 2 | 1.9% | 20 | 0 | 0% | 23 | 1 | 4.3% | 16 | 1 | 6.2% |
| Clerical (4, 5) | 67 | 1 | 1.5% | 33 | 1 | 3.0% | 27 | 1 | 3.5% | 25 | 0 | 0% |
| Clerical (6 & up) | 26 | 0 | 0% | 19 | 0 | 0% | 19 | 0 | 0% | 12 | 1 | 8.3% |
| Misc Serv Oper | 12 | 11 | 91.7% | 36 | 26 | 72.2% | 30 | 25 | 83.3% | 17 | 16 | 94.1% |
| Other | 32 | 2 | 6.2% | 16 | 0 | 0% | 9 | 0 | 0% | 3 | 0 | 0% |

| Job | 1968 | | | 1969 | | | 1970 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Tot. | Blk. | % | Tot. | Blk. | % | Tot. | Blk. | % |
| Lab Tech | 123 | 8 | 6.5% | 91 | 5 | 5.5% | 0 | 0 | 0% |
| Test & Proc Tech | 41 | 8 | 19.5% | 39 | 6 | 15.4% | 0 | 0 | 0% |
| Mechanic | 4 | 0 | 0% | 10 | 0 | 0% | 0 | 0 | 0% |
| Clerical (2, 3) | 26 | 5 | 19.2% | 24 | 4 | 16.7% | 5 | 1 | 20.0% |
| Clerical (4, 5) | 25 | 1 | 4.0% | 21 | 1 | 4.8% | 9 | 1 | 11.1% |
| Clerical (6 & up) | 8 | 0 | 0% | 4 | 0 | 0% | 3 | 0 | 0% |
| Misc Serv Oper | 30 | 29 | 96.7% | 37 | 36 | 97.3% | 0 | 0 | 0% |
| Other | 1 | 0 | 0% | 17 | 4 | 23.5% | 6 | 1 | 16.7% |

| Job | 1971 | | |
|---|---|---|---|
| | Tot. | Blk. | % |
| Lab Tech | 0 | 0 | 0% |
| Test & Proc Tech | 4 | 2 | 50.0% |
| Mechanic | 0 | 0 | 0% |
| Clerical (2, 3) | 0 | 0 | 0% |
| Clerical (4, 5) | 2 | 0 | 0% |
| Clerical (6 & up) | 0 | 0 | 0% |
| Util Oper Prod [32] | 21 | 9 | 42.9% |
| Other | 2 | 0 | 0% |

The Government points out that from 1965 through 1969 the overwhelming majority of blacks was still being assigned to MSO positions. Thus, from 1965 to 1969, of the 150 employees assigned to Miscellaneous Service Operator 132, or 88%, were black. Moreover, the Government stresses, those blacks who weren't assigned to the Service work unit were assigned to the lower level lesser paying jobs among the technician and clerical positions. For example, of the 161 employees assigned to Processing and Test- ing Technician jobs (level 6) during this period 9.9% (16) were black; in contrast, of the 499 employees assigned upon hire to Laboratory Technician jobs (level 8) only 4% (20) were black. The Government also perceives a similar pattern in the clerical job area. Of the 109 employees assigned to level 2 and 3 clerical jobs, 11 or 10.1% were black, whereas of 131 employees assigned to level 4 and 5 clerical jobs, 4 (3%) were black and of 62 employees assigned to clerical level 6 and above, only 1 (1.6%) was black.

31. Source: PX–64, DX–84. I accept the laboratory technician hiring figures shown in DX–84.

32. This job appears for the first time in 1971; however, it was not until 1972 when defendant first employed significant numbers in this category.

Finally, the Government stresses that from 1965–1969 only 1 black was assigned to a mechanic's job while 60 whites were being assigned to this job.

DuPont's principal response to the Government's argument based on these statistics is that it erroneously assumes that all blacks in the available work force are qualified to perform each category of job. It maintains that the disparity between the percentages of blacks assigned on initial hire to higher and lower level jobs is attributable to the requirements of those jobs and the numbers of black applicants qualified to perform them. Primary reliance is placed upon the fact that the qualification tests administered to applicants have been conceded to be accurate predictions of the ability to adequately perform the jobs. This fact combined with other evidence tending to show equal access to testing for blacks and equal, if not preferential, treatment of blacks by employment personnel is said to demonstrate that DuPont's employment practices have no unjustified disparate impact.

■ There can be no argument with DuPont's basic premise. If validated tests are the sole criterion of employment in the higher level jobs and there is equal access to testing, it follows that any statistical disparity which results is justified by the employer's requirements. Or stated somewhat differently, in such circumstances the available pool is the pool of those who pass the test and if those who pass the test are hired to the jobs for which they have qualified, there will be no disparity in racial composition between those hired for a particular category of job and the available qualified labor pool.

DuPont's argument rests upon a factual assumption of equal access, however, an issue as to which there is conflicting testimony. Before addressing this credibility question, I will analyze the statistical evidence to determine whether it is of aid in answering that question and in resolving the overall issue of disparate impact.

(a) *The statistical evidence.*

■ The analysis of the statistical evidence must commence with the realization that labor market and hiring data cannot be evaluated without reference to the job skills involved. *Hazelwood, supra.* While this seems obvious, it is ignored by the Government's argument that higher percentages of blacks assigned to lower level jobs than to higher level ones demonstrates disparate impact. Statistics showing a higher percentage of blacks assigned to lower level jobs does not, in and of itself, establish a disparate impact upon blacks. If the percentage of blacks assigned to the higher skilled jobs is reflective of those blacks in the labor pool who are qualified to perform them, for example, the fact that a higher percentage of jobs requiring lesser skills went to blacks does not indicate disparate impact. Thus, if 4% reflects the black participation in the available labor pool of those qualified to perform level 8 lab tech jobs, and 9.9% reflects the black participation in the comparable pool for level 6 jobs, the fact that 88% of the MSO jobs went to blacks would not alone suggest discrimination against blacks. The more reasonable inference would be that substantially more blacks than whites were willing to take the service worker jobs.

During the period which the Government picks as the "worst case" of discrimination in initial job assignment, 57.5% of all jobs filled were technician jobs. If DuPont's facially neutral hiring and assignment policies were being applied by its personnel in a discriminatory fashion, one would expect the statistics relating to this segment of new hires to reflect that fact. While the data is far from satisfactory in the lab tech area, I conclude that the statistics do not show disparate impact.

As earlier noted, blacks constituted 9.9% of those hired to testing and processing technician jobs. Most of these 161 hires were to testing technician jobs.[33] Testing technicians set up and operate testing equipment to carry out a variety of physi-

---

**33.** PX–54.

cal, chemical and optical tests. They tabulate data and calculate tests results. At the time of trial, testing technicians were receiving approximately $11,000 per year. The testing technician test seeks to ascertain whether an applicant has the basic math and measuring skills required for the job. While the skill level required is not high, it is safe to say that not all of the work force is qualified. Even if an 11.2% figure is. utilized as the black portion of the available labor pool, however, the disparity between the expected value of 18.032 black hires and the observed 16 blacks actually hired as testing and processing technicians is not statistically significant.[34]

While laboratory technician jobs differ in character depending upon the laboratory unit involved, their basic function is to carry out various chemical and textile processes for professional employees and to report the results to them. The work is not confined to the repetition of a single process. An ability to read and apply technical instructions and to work with formulas, percentages, ratios, fractions and the like is required. Based upon the testimony and the inspection of the sites, one can say beyond peradventure that a substantial segment of the labor force does not have the requisite skills to successfully perform these jobs. Ascertaining with any degree of precision what segment of the labor force is qualified, however, is not possible on the present record. All one can do is look to the best available evidence and try to get an idea of range in which the black population of the qualified labor pool might fall.

The Government did not introduce any occupational breakdown of the labor force. While DuPont introduced occupational figures for the Wilmington SMSA from the 1970 census, the evidence concerning the composition of the possibly relevant categories is scant and the two categories which would appear to be the most relevant show substantially different black population. The "Chemical Technician" category (total

population 2,166) shows a black population of 3.7%, while the substantially smaller "Clinical Lab Technologist and Technician" category (total population 288) shows a black population of 9.4%. If these categories are combined as a rough guide, the black population would be 4.4%.

In addition to the SMSA figures, DuPont offers two other suggestions. Each is flawed but of some help. First, DuPont suggests that the kinds of skills required of a laboratory technician are ones ordinarily learned in high school and that there is a "high correlation" between the ability to perform these jobs and the level of skill of high school graduates. While the record cited in support of this "high correlation" is not strong, there is reason to believe that some correlation does exist. For example, 89% of those employed nationally in jobs which the census categorizes as science and engineering technicians have a high school education. If one makes the assumption that a high school education is some indicia of the qualifications required for the lab tech job and applies the best available 1970 Wilmington SMSA figures showing 33.3% of all blacks and 90.9% of all whites having completed high school, one would expect blacks to represent 3.7% of the qualified labor pool.

DuPont's second suggestion is based upon evidence introduced by the Government showing the pass-fail rates among 382 whites and 75 blacks who took the validated laboratory technician test prior to 1972. The pass rate for whites was 80% and for blacks was 25%. If one assumes a black labor force population of 11.2% and a 80%–25% pass rate for whites and blacks, respectively, one would expect 3.8% of the qualified labor force to be black.

As the Government points out, the 25% pass rate is not a wholly reliable indicator of how the available black work force might fare when taking the test. While this testing data was put into evidence

---

**34.** For the relevant formula see *Castaneda v. Partida*, 430 U.S. 482, n.17, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977). Under that formula, the expected value of 18.032 blacks is only about

one-half standard deviation greater than the observed 16 hires. *Castaneda* suggests, and I conclude, that this is not statistically significant.

without explanatory comment, there appears to be no dispute that the people represented in the sample were people who were at some point actually employed by DuPont (and, therefore, had their test scores retained in their personnel folders). The Government, therefore, suggests it is likely that employees assigned to the Service work unit represented a substantial segment of the black sample and, accordingly, that a sample consisting of all black *applicants* might have fared better.[35] While this is true, PX–61A suggests that the sample contained employees from a fairly broad spread of departments, many of which are not in the Service work unit.[36]

These available qualified labor force percentages are each subject to some question. They may be conservative, as the Government strenuously maintains. In the Court's judgment, however, they represent the best indicia in the record of the qualified pool. Moreover, even if one assumes that the qualified labor pool during the 1965 to 1969 period was 5% black, the expected value would be 24.95 and the observed value in DuPont's hires to lab tech jobs was 20. The difference is not statistically significant.[37]

Turning to the clerical area, the 10.1% black participation in the 109 hires to the unskilled and lesser skilled level 2 and 3 jobs [38] does not represent a statistically significant deviation from the black percentage in the available general labor force. The record contains insufficient information to relate most of the data on hires to the level 4 and 5, and level 6 and above data with an available qualified labor pool. One can say that there is a disparity between the black participation in hires during the 1965–1969 period to Stenographer B positions and the participation of blacks in the "Stenographers" census category for the

Wilmington SMSA in 1970. Of 98 hires to that position during this period, only 2 or slightly more than 2% were black. Of those employed as stenographers in the SMSA in 1970, 6.2% were black. This figure must be viewed, however, in light of the fact that the black stenographer population in the same area in 1960 was only .3%. While it is concededly a guess, if one assumes a 5% average availability pool throughout the 1965 to 1969 period, the expected value would be 4.9, as compared with the observed value of 2. While I consider this evidence regarding the hiring of stenographers to be relevant on the issue of disparate impact, the disparity is not sufficient to make the inference of discrimination compelling. The expected value of 4.9 is 1.35 standard deviations greater than the observed value of 2. Under the standards suggested in *Castaneda v. Partida, supra,* for substantially larger pools, a disparity of this size does not require a conclusion that race was a factor in the selection process.

The Government's strongest statistical case is in the area of hires to skilled craft positions, i. e., electricians, instrument mechanics, sheet metal workers, pipefitters, machinists, millwrights, carpenters and welders. During 1965 to 1969 only 1.4% of new hires were black. The 1960 and 1970 SMSA figures for black craft positions were as follows:

Black Availability—Wilmington SMSA

| Job Category | 1970 (Dx27) | 1960 (Table 122) |
|---|---|---|
| Carpenters | 2.3% (51/2214) | 3.6% (57/1591) |
| Electricians | 1.7% (31/1816) | 1.0% (13/1277) |
| Machinists | 4.3% (48/1128) | 2.2% (25/1124) |
| Millwrights | 2.0% (12/604) | 0% (0/433) |
| Sheetmetal Workers | 3.1% (15/490) | 2.0% (7/357) |
| Welders and Framecutters | 9.2% (130/1412) | 5.0% (50/993) |

**35.** While *applicant* testing scores were retained from 1972 the number of blacks who took the level 8 Lab Tech Test was too small to be statistically significant.

**36.** While no explanatory testimony was introduced by the Government along with PX–61A and PX–69, it is possible to get some idea of which departments were involved by comparison with other exhibits. *See,* e. g., DX–68.

**37.** The expected value is slightly more than one standard deviation greater than the observed value. This is not statistically significant. *See* fn. 34, *supra.*

**38.** E. g., mail clerk B, file clerk and typist B.

While the record does not contain a breakdown of hires which would permit a detailed analysis, it appears that there is a significant disparity in this area.[39]

In summary, I find the statistical data concerning initial hires as a whole to be inconclusive. While some portions of it standing alone might support a finding of disparate impact, the total statistical data do not require such a conclusion. Accordingly, I turn to the non-statistical evidence.

### (b) *The non-statistical evidence.*

Throughout the post-Act period it has been the stated policy of management to hire qualified blacks at all levels. There have been standing instructions throughout the period that no qualified black was to be turned down if there was an opening. The personnel people understood the significance of these instructions. Each year forecasts had to be made, goals had to be set for hiring minorities, and the results had to be reported to the AEC (later ERDA) and the EEOC. Compliance reviews were conducted by the AEC in January of 1964, September of 1969, and May of 1972.

There is evidence, which I credit, indicating that management's instructions were carried out. At no time was a black who passed the laboratory technician test not hired as a laboratory technician when a position was open. The same can be said for any black who qualified on the clerical test. Prior to 1969, only one black who qualified by test for a testing technician job was denied placement in an opening in that job category. After 1969, there were far more qualified applicants for the processing technician jobs than there were openings. The personnel office was instructed during that period to try to hire one black in every 5 placements and the results suggest that

this goal was achieved. The record shows that from 1969 through 1974, 20.1% of those hired as processing technicians were black.[40]

The record also shows that other preferences were given to blacks. Frequently, for example, jobs were left open for a period, even though there were qualified whites to fill them, in the hope that a qualified black would be found.

The only area open to serious debate is whether blacks had equal access to testing during the 1965 to 1972 period. While Du-Pont argues that each applicant during the initial interview was told of the various categories of jobs performed on the site and offered the opportunity to take any test which he chose, the record does not support such a finding. I believe the testimony that no black who requested a particular position during the post-Act period was denied the opportunity to take the appropriate test, but it seems clear that those numerous applicants who did not apply for a particular job were not automatically offered their choice of test.

First, Mr. Otteni, the man who did most of the interviewing between 1965 and 1975, acknowledged that he tried to interest applicants in whatever job or jobs he had open at the time, and the fair inference from his testimony is that if he had an MSO or clerk's job open but no laboratory technician job open, he would attempt to hire for the opening without offering the lab tech test. Given the job transfer system, and the orientation system in the post-Act period, this was not an unreasonable approach and I see no reason to believe that it operated to the detriment of blacks or whites during this period.

But Messrs. Otteni, Antonio and Strange, as well as Ms. Lawson, further testified that the offering of the laboratory techni-

---

**39.** The hiring experience after the 1965 to 1969 period improved substantially. As of December 31, 1973, 8.6% of DuPont's craft positions were held by blacks. As of August 31, 1976, after a sizeable reduction in force, the figure was 6.6%.

**40.** PX–64. Implicit in these findings is the conclusion that during the post-Act period lack of prior experience or a high school diploma did not affect the employment opportunities of those blacks *who qualified by testing.*

cian test was not automatic even when lab tech positions were open. Subjective judgment was exercised based on the background information contained in the application, any interests expressed by the applicant, the interviewer's knowledge of the job requirements from the written job descriptions and the interviewer's prior experience with previous testing of applicants and employees. Thus, the system left room for the operation of racial bias and racially stereotyped images which might be harbored by white interviewers.[41] The crucial question, therefore, is whether the exercise of this discretion at the initial interview stage was an employment procedure which in practice had a disparate impact upon blacks. If it impacted equally on blacks and whites, there was no Title VII violation.

First of all, it is clear from the record that special efforts were made by Mr. Otteni and others to search out and hire black stenographers and craftsmen. In view of these efforts, I cannot believe there were black candidates during the post-Act period who had a conceivable chance to qualify but who were not offered the appropriate tests. Accordingly, I do not find the statistical data showing few hires to these positions to be of aid in resolving the issue of whether the initial interview practice had a disparate impact.

The only direct statistical evidence regarding accessibility to testing pertains to the period from 1972 to April, 1976. The application log maintained during that period shows that 32.7% of non-black applicants took tests while 47.7% of all black applicants were tested. This indicates that during this period, the initial interview procedure did not have a disparate impact on blacks in terms of test accessibility.

There was no evidence of a material change in procedure or interviewing personnel between the 1965 to 1969 period and this later interval. Nevertheless, the Government correctly points out that these figures are from a period most of which was after the filing of this lawsuit, and argues that they are, accordingly, suspect. I agree that this fact diminishes their probative value insofar as the earlier period is concerned, but I believe the figures for the earlier period, if available, would reflect a similar pattern.

There are two primary reasons for this. First, this suit did not bring the first equal employment opportunity pressure on the personnel people at Chestnut Run. Mr. Otteni, the principal interviewer, was acutely aware in the 1965 to 1969 period of the efforts being made, and previously made, by his superiors to move black employees out of the Service work unit. He administered the Beta and job qualification testing which resulted from these efforts. He was also aware of the reporting requirements and compliance reviews. The instructions from his superiors to hire blacks were loud and clear and he knew both they and he would be accountable for the result. In short, I believe that the pressures during the 1965 to 1969 period were such that it is unlikely that his judgment during this period was exercised to the disadvantage of blacks.

The other relevant evidence which I credit is the testimony of Ms. Lawson. Testimony from the Government's black witnesses as well as her own testimony persuades me of her objectivity and candor. She worked closely enough with Mr. Otteni that I believe she would have perceived racial bias in the performance of his responsibility if it had existed during this period. She candidly admitted the subjective element in the interview process but testified that she had never observed any favoritism to whites. To the contrary, she indicated that, in many instances, black applicants received preferential treatment.

It is, of course, possible that the exercise of subjective judgment resulted in some

---

**41.** Mr. Otteni and Ms. Lawson, who are white, did the interviewing prior to 1974. In that year an office was opened at Christina Lab and William Lee, a black, conducted the interviewing there.

blacks not being tested who should have been. I am not persuaded, however, that blacks as a group had less accessibility to testing than did whites in the 1965 to 1969 period.

### B. *Exempts.*

Defendant's exempt work force is composed of supervisory personnel and professionals. The former come from promotions of non-exempt people, from transfers to the sites from other DuPont facilities, and occasionally from college recruitment. The Government's position is that "defendant's discrimination in filling supervisory jobs operates principally in its promotion of non-exempts within the facilities rather than in its hiring policies". Def. Reply Br. VI–33. Thus, as far as discrimination in the *hiring* of exempts is concerned, the Government focuses solely on the hiring of professionals.

Before analyzing the data regarding hiring of professionals, I note that the only group of exempts which is directly involved is that involved in administering the landlord function at the sites. In my earlier Opinion, I ruled that because of the scope of the proceedings before the EEOC, the scope of this suit was limited to "those operations conducted at Chestnut Run and Christina Lab by non-exempt employees and exempt employees associated with the landlord operation". 373 F.Supp. at 1337. The Court noted at that time:

To the extent there can be debate about the scope of the relevant segment of Du-Pont's operations, it is because the Commission has consistently maintained that this suit is not limited to the scope of its determination and has not taken a clear position as to the precise scope of the 1,600 employee operations referred to in its determination. If the Commission believes the Court has erred in interpreting the segment of DuPont's operations to which its determination was directed, it

may hereafter bring any clarifying data to the Court's attention.

In its post-trial briefing the Government has asked the Court to redefine the scope of the suit to include all exempt employees attached to the Textile Fibers Department on the sites without reference to whether they are associated with the "landlord operation" of that Department. I do not think it would be fair to do so. Any relief to be granted with respect to exempts must be confined to the landlord function of defendant's operations. What little information there is in the record regarding the procedures for hiring exempts, however, suggests no distinction in terms of employment practices between the hiring of exempts to the landlord function and to other areas of responsibility. For this reason, I consider the data relied upon by the Government to be relevant evidence.

Although the Government casts its argument in terms of the hiring of professionals, it has tendered no compilation of data showing the number of hires to professional positions during the relevant period or the racial composition of this group. Rather, the Government relies on figures showing the racial composition of the "Professional" segment of DuPont's work force at the end of each year throughout the post-Act period. These figures, which reflect a work force produced by transfers as well as hires, are shown in the following table:

EXEMPT PROFESSIONALS AT CHESTNUT RUN AND CHRISTINA LABORATORIES COMBINED BY RACE AND YEAR

| Year End | Total | Black | % Black |
|----------|-------|-------|---------|
| 1965 | 93 | 1 | 1.1% |
| 1966 | 92 | 2 | 2.2% |
| 1967 | 86 | 3 | 3.5% |
| 1968 | 90 | 1 | 1.1% |
| 1969 | 97 | 1 | 1.0% |
| 1970 | 76 | 0 | 0.0% |
| 1971 | 67 | 0 | 0.0% |
| 1972 | 62 | 3 | 5.5% |
| 1973 | 72 | 1 | 1.5% |
| 1974 | 73 | 0 | 0.0% |
| 1975 | 61 | 0 | 0.0% |
| 8/31/76 | 59 | 1 | 1.6% |

Source: DX–100; PX–54.[42]

---

42. The defendant's figures are somewhat different. See DX–100 "Both Sites" Table. I have been unable to determine precisely which jobs are included in the "Professional" category

The ranks of DuPont professionals, according to the Government,[43] are composed of chemists, chemical engineers, accountants, computer specialists, and a physician. The Government points out that the only blacks employed by DuPont at the sites as professionals have been chemists. No black has filled a job in one of the other categories. One can deduce from this fact and the foregoing table that at least six blacks have been hired or transferred to chemist jobs on the sites during the post-Act period.

The record contains no clear explanation of where DuPont's professional workers have come from. The most reasonable inference from the record is that they have come to the sites by way of recruitment from college campuses and by way of transfer from other DuPont locations around the country. If this be the fact, a national market area is the logical choice for the purpose of analyzing the data.[44]

The Government suggests that those which the census classifies as "professional, technical, and kindred workers" represent the segment of the labor force qualified to perform DuPont's professional jobs. In 1970, blacks comprised 5.4% of this category nationally. It is a large and diverse category, however. It accounts for 15% of the national labor force and includes dozens of groups whose background bears no relationship to the skills required by DuPont's professional positions.[45] It also includes tech-

nicians, who are not classified as or included in the DuPont professional figures relied upon by the Government. The data on professional, technical and kindred workers is, accordingly, inappropriate for use in evaluating DuPont's record with respect to professional workers.[46]

Given the qualifications required for DuPont's professional workers, the following 1970 census data is the best available for evaluating DuPont's performance in this area:

### BLACK AVAILABILITY—UNITED STATES

| | |
|---|---|
| Engineers (all) | 1.1% |
| Chemical Engineers | .8% |
| Chemists | 3.6% |
| Accountants | 2.3% |
| Physicians | 2.2% |

A comparison of this data with the data which reflects the racial composition of DuPont's professional work force during the post-Act period and which comprises the Government's whole case in this area does not raise the inference that its employment practices in this area have had a disparate impact upon blacks. Moreover, there is other data in the record which, though incomplete, provides a more relevant comparison with the racial composition of the qualified labor force. By comparing the year end rolls for the years from 1969 to 1975 and the August 31, 1976 roll, one can ascertain the names and race of the non-supervisory exempts who first appeared on roll at years end in 1970 through 1975 and on August 31,

---

and, accordingly, have been unable to determine from the raw data (PX–54) which figures are the more accurate. The general pattern reflected in DX–100 is similar, however. In making a comparison it must be noted that DX–100 shows the work force as of January 1 of each year.

**43.** Plaintiff's Reply Br. VI–37. While the record suggests that some others may be included within the "Professional" group, these professionals appear to comprise most of the group.

**44.** There is no evidence concerning the geographical scope of DuPont's college recruiting efforts. It may be that they would suggest a regional market but given the relevant *qualified* labor force, I doubt that any difference would be substantial. Similarly, while I am not persuaded that Dr. Haber's combination of the

Wilmington and Philadelphia SMSA's is a reasonable selection given the few available facts regarding the origin of DuPont's professionals, the difference between the Court's conclusions concerning the relevant labor pool and those of Dr. Haber lies principally in the choice of the occupational categories determined to be qualified.

**45.** See Appendix L to Def.'s Br.

**46.** If one includes DuPont's technicians with its professionals for example, one finds that 6.8% of this segment of its work force was black as of 1974 and that this figure had arisen to 7.5% by March of 1976. This is substantially in excess of the 1970 national (5.4%) and Wilmington SMSA (4.8%) figures for professional, technical and kindred workers.

1976.[47] This is more helpful than the racial composition of DuPont's population of professionals at year's end because it reflects the *movement* of blacks and whites into professional positions and does not reflect pre-Act hiring. The figures thus obtained show 35 new non-supervisory exempts from 1970 through August, 1976, of whom 4 were black.[48] This represents a figure of 11% black participation which compares favorably with the black population in the relevant labor force.

In this context, the fact that no blacks have been hired or transferred into professional job categories other than chemists does not alone warrant an inference that the system discriminates.

## VI. TRANSFER, PROMOTION AND SENIORITY SYSTEMS.

Plaintiff also charges that DuPont discriminates against its black employees through its transfer, progression, promotion and seniority systems.

As heretofore noted, jobs at the Chestnut Run and Christina site are either below, at, or above the "career level". Since the procedures governing the filling of vacancies up to career level differ from those governing the filling of vacancies above career level, I will address the two separately.

### A. *Movement To Career Level.*

The quality of each worker's performance is formally assessed each year through the "annual performance review" (PX–11 at p. 2201, *et seq.*). Each employee's first line supervisor, after consultation with his or her superior, rates the employee on such factors as safety, housekeeping, quality, quantity, dependability, cooperation, and

adaptability. (PX–11 at p. 2203).[49] The employee is notified in advance that this evaluation is taking place, and several days after such notification the supervisor discusses the evaluation with the employee. After this discussion, the supervisor completes a formal evaluation which passes up the supervisory chain for review and then is filed with the employee's personnel records. (Strange P–26–31).

An employee who is dissatisfied with the formal evaluation may either complain to the supervisor's superiors or may go to the industrial relations supervisor. An employee's grievance concerning the accuracy of an annual performance review would go through the area supervisor level to the superintendent and ultimately to the site manager's office before a final decision was made. (Strange P–31).

A vacancy at career level or below is offered first to the employee in that unit with the most work unit seniority who is willing to accept the position and who is qualified for it. To be qualified the employee must pass or have passed any requisite test and must have a satisfactory or better rating in his or her present job.[50] Acceptance of the position by an employee within the work unit is likely to create, in turn, a sequence of other vacancies within that unit. (Gray H–111).

At Chestnut Run, if the job is not or cannot be filled by someone in the work unit, the site-wide job transfer request system is invoked. The employee on the job transfer list who has the greatest amount of company service is the first to be offered the job. (PX–11 at p. 2003). If the person on the list refuses the opportunity, the next

---

**47.** The record contains computer printouts showing those on roll at year's end only from December 31, 1968 to the present. It is clear that the 1968 printout is in error in its reporting of exempts. For these reasons the only available data on new exempts reflects the period from 1970 to the present.

**48.** Appendix J. Def. Br. This data would not include any white or black non-supervisory exempts who may have come on roll and left prior to the end of the year. Nevertheless, I

consider this tabulation a fair approximation of the movement into non-supervisory exempt positions during the 1970 to 1976 period.

**49.** What constitutes an outstanding, good, satisfactory, or unsatisfactory rating with respect to each of these factors is discussed in some detail in the company's supervisory guide (PX–11 at p. 2203).

**50.** PX–11 at p. 2002.

most senior employee in terms of company service who is qualified is contacted. If the list is exhausted without the vacancy being filled, the company next goes on to the "gate" to hire a new employee.[51]

Since Christina Laboratory is a single work unit, all movement at that site is governed by work unit seniority. (Strange D–95–96). Christina work unit employees may use the job transfer request system to fill vacancies in Chestnut Run administrative work units, but not in laboratory work units. (Strange D–100–101). However, Christina employees with prior service at Chestnut Run are permitted to transfer into work units outside of the administrative work units. (PX–11 at p. 2002–17; Antonio E–39–40).

The Government challenges these procedures for progressing employees up to career level jobs because it claims that they involve (1) a work unit seniority system which perpetuates past discrimination against blacks,[52] (2) subjective job evaluations made by a largely white supervisory staff, and (3) inadequate notice to blacks of job openings. In support of its position, the Government points to data indicating that there have been substantially more upgradings and promotions of blacks in the lower paying job categories of operatives, laborers, and service workers than at higher levels. Reliance is also placed on the testimony of several individual black employees who complained that whites have been preferred over them in the promotion process.

### 1. Seniority.

The Government acknowledges the Supreme Court's opinions in *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977) and *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977) which held that Section 703(h) of Title VII[53] permits an employer to utilize a "bona fide" seniority system even though it perpetuates the effects of pre-Act discrimination so long as the utilization of such a seniority system is not the result of racially discriminatory intent. It argues, however, that the seniority system here at issue is not protected under Section 703(h) because that Section applies only to union-management negotiated seniority systems and not to unilateral company systems. I find no support in either the statutory language of Section 703(h) or in the Supreme Court's opinions for such a conclusion. Section 703(h) on its face provides:

Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation or different terms, conditions, or privileges of employment, pursuant to a bona fide seniority . . . system, . . . provided that such differences are not the result of an intention to discriminate because of race . . . or national origin. . . .

The legislative history discussed by the court in *Teamsters* makes it clear that Congress enacted Section 703(h) to avoid penalizing current workers for an employer's pre-Act discrimination. As the court noted:

Although a seniority system inevitably tends to perpetuate the effects of pre-Act discrimination . . . the Congressional judgment was that Title VII should not outlaw the use of existing seniority lists and thereby destroy or water down the vested seniority rights of employees simply because their employer had engaged in discrimination prior to the passage of the Act.

---

**51.** During times of a reduction of force, an employee involuntarily removed from a job and/or a work unit has the "vested right" to return to the unit or the job before an employee who has never been in that unit or that job. (PX–11, 2008–Rev.).

**52.** When blacks hired as MSO's prior to 1960 were subsequently permitted to transfer into other units, they acquired work unit seniority in those units only as of the date of their transfer. Thus, to the extent that progression within the new work unit is governed by work unit seniority, blacks who only began acquiring non-service work unit seniority after 1960 are disadvantaged.

**53.** 42 U.S.C. § 2000e–2(h).

431 U.S. at 352, 97 S.Ct. at 1863. That a current employee expects to have certain seniority rights because of a plan adopted at the employer's initiative, as opposed to a plan negotiated between labor and management, in no way diminishes that employee's expectations and it is those expectations which Section 703(h) was designed to protect.[54]

While it is true that the work unit seniority aspect to defendant's promotional system holds the potential for a disparate impact on those blacks hired into the Service work unit prior to 1960, it is clear that this aspect of the system was established in the 1950's for purposes other than discrimination against blacks. Accordingly, it is a "bona fide" seniority system within the meaning of Section 703(h) and any potential for disparate impact is not a legally cognizable injury under Title VII.

### 2. Performance evaluations.

While it is true that supervision is still predominantly white and that the performance criteria leave some room for discretion, there is no substance to the charge that DuPont's promotion process is one based on the unfettered subjective judgment of first line supervisory staff. No evaluation is even discussed with an employee before it is reviewed by the first line supervisor's own supervisor. An unsatisfactory performance evaluation is reviewed all the way up the lines of supervision in the work unit to the superintendent before it is discussed with an employee. The supervisory guide lists those factors which are to be evaluated by supervision and describes in detail what performance is necessary to achieve a par-

ticular rating for each factor. In addition the supervisory guide lays out for the supervisor the philosophy behind requiring high standards of performance on each of the designated factors. (PX–11 at 2200, *et seq.*). Employees dissatisfied with the annual performance review rating may take their complaints to higher levels of supervision within the work unit or to the industrial relations office.[55] The existence of written evaluation criteria, the presence of automatic review procedures, and the opportunity for an employee to seek further review in the event of that employee's dissatisfaction with his evaluation serve to insulate defendant's employees from bias which may exist on the part of any particular supervisor.

It is also important to note that the record is devoid of any evidence indicating that the "satisfactory or better" requirement has proved to be a significant hurdle for blacks seeking promotion to career level jobs. "Unsatisfactory" ratings appear to have been rare[56] and there is no evidence suggesting that blacks have received more of those ratings than whites.

### 3. Information about advancement opportunities.

Plaintiff also contends that defendant's failure to post job vacancies, when they occur, results in black employees being unaware of the opportunities available and thus has a disparate impact. While it is true that openings are not posted, the system as a whole does not operate to the disadvantage of blacks.

---

**54.** The Government points out that, because DuPont's work unit seniority system is not embodied in a collective bargaining agreement, it is subject to a unilateral change or revocation by management. I do not perceive this to be legally relevant given the facts of this case. While a few changes have been made in the job transfer system since the 50's, the work unit seniority policy has remained in effect and has been consistently applied since that time. It is a wholly objective system which has now been computerized. In short, it is not a "sometimes" thing, and has generated the kind of expecta-

tions among DuPont's work force that Section 703(h) was designed to protect.

**55.** An employee placed on probation and facing ultimate discharge has even more elaborate procedural protection including a review by the site manager and his staff with the industrial relations supervisor acting in defense of the employee facing discharge. (Strange P–39–42).

**56.** In 1975, for example, only 4 of the 957 non-exempt employees received an unsatisfactory rating. (DX–105).

Under defendant's transfer and promotion system, no employee applies for a particular job opening. Rather an employee files with the personnel office a job transfer request form which the office then consults whenever a job vacancy in that particular category comes open. Anyone who has a job transfer request for that position on file is considered for transfer or promotion whichever the case may be in order of his or her company service. Such a system does not operate to exclude blacks. Moreover, pre-designation by an employee of the job to which the employee desires transfer is an efficient way for management to fill job vacancies quickly while still considering all those interested in the job vacancy and also of insuring that employees who might otherwise be interested are not excluded from consideration because they failed to notice a posted job vacancy through inadvertence, or absence during vacation or sick leave. (Antonio J–174–177; Gray H–109–110).[57]

Plaintiff contends further that even if the job transfer request system for filling vacancies is not itself discriminatory, the company failed to notify black employees that such procedures were available. Plaintiff points in particular to the testimony by several of defendant's black employees that they were not informed by personnel or supervision that transfer and promotion opportunities within the company existed.[58] As I have earlier noted, however, while I can believe that information concerning opportunities for transfer and promotion to previously all white jobs may not have been effectively communicated in the years immediately following management's adoption of an equal opportunity policy, the record as a whole convinces me that this information was being effectively communicated during the post-Act period. Given the canvassing of black service workers during the pre-Act period, the number of tests taken by those workers prior to the effective date, and the number of transfers from the Service work unit prior to that date, I conclude that any failure on the part of individual black employees to appreciate the opportunities for transfer and promotion cannot reasonably be said to be the fault of defendant's employment practices and procedures.[59]

Three of the six black employees whose testimony is cited in support of this segment of plaintiff's argument expressly acknowledged that they had been informed of that policy by the effective date of Title VII. (Cale F–175, S–170–171; Twyman F–45–47; W. Slaughter G–147–148). Curtis Slaughter denied knowing about the transfer and promotion policy, yet was aware of the canvassing effort by supervision in response to his brother's efforts to improve the status of black employees in the Service work unit. Moreover, he himself took a lab technician test on July 8, 1965 and he testified that he did so in response to supervision's prior canvassing. Herbert Starks was aware that transfer procedures existed at least by January, 1966 when he took the

---

57. It is true that prior to 1972, defendant only permitted an employee to keep one job transfer request at a time on file. The Government's employee witnesses did not complain of this restriction and there is no evidence indicating to what extent, as a practical matter, it tended to impede the mobility of employees. To the extent that it adversely affected mobility, this limitation held the potential of perpetuating the effects of DuPont's pre-Act discrimination in the assignment of blacks to the Service work unit. Given the efforts to move pre-Act hires from that unit, the results of those efforts, and the number of openings in higher level jobs in the 1965 to 1969 period, I am not persuaded that it had the effect of perpetuating the pre-Act discrimination.

58. See Twyman S–149; M. Anderson S–132–134; C. Slaughter S–136; Starks S–155–156; Cale F–161; W. Slaughter T–117.

59. I do not suggest that DuPont's coverage was 100% effective. There undoubtedly were instances where employees did not get the message. But this record does not suggest to me that this happened more frequently in the case of black employees than in the case of whites. The testimony of the only two white employees who testified at trial indicates, for example, that they themselves had not been informed of the company's transfer and promotion policies. (Cain E–146–147; Drummond F–149–151).

lab technician test for the first time. All of the black employees who testified that they were not aware of the company's transfer procedures in the early 60's ultimately took advantage of those transfer procedures in subsequent years.[60]

In sum, the record does not support plaintiff's contention that DuPont discriminated against blacks in transfer and promotion by denying them equal access to information about advancement opportunities.

#### 4. *Statistics.*

The record reflects the following black populations during the period from 1968 to August 31, 1976:

| YEARS END | CAREER LEVEL TECHNICIANS [61] | CAREER LEVEL OFFICE & CLERICAL | CAREER LEVEL CRAFTSMEN [62] |
|---|---|---|---|
| 1968 | 1.2% (5 of 420) | 0% (0 of 47) | 0% (0 of 85) |
| 1969 | 2.1% (9 of 438) | 0% (0 of 37) | 0% (0 of 94) |
| 1970 | 2.0% (10 of 501) | 5.3% (2 of 38) | 0% (0 of 134) |
| 1971 | 2.3% (11 of 478) | 4.8% (2 of 42) | 2.1% (3 of 140) |
| 1972 | 5.4% (28 of 523) | 4.4% (2 of 45) | .7% (1 of 144) |
| 1973 | 7.5% (39 of 517) | 7.1% (3 of 42) | 2.1% (3 of 144) |
| 1974 | 5.8% (17 of 462) | 7.0% (3 of 43) | 2.0% (3 of 147) |
| 1975 | 7.8% (36 of 460) | 4.8% (2 of 42) [63] | 6.0% (9 of 150) |
| 1976 | 7.8% (35 of 446) | 2.4% (1 of 41) [63] | 5.6% (8 of 144) [64] |

These figures by themselves do not demonstrate a disparate impact upon blacks from the procedures governing movement to career level jobs. The Government has not tendered a position with respect to the qualified labor pool for promotions to these positions and the testing requirement for the vast majority of such promotions makes reference to the black population of lower job categories in DuPont's work force inappropriate for this purpose. Here, as in the area of job assignment, the non-statistical evidence is the most persuasive in the final analysis.

I am convinced by the evidence that blacks who passed the required tests and qualified by seniority were promoted when positions were available. This fact, together with the conceded validity of the tests and my finding that blacks in the post-Act period had equal access to testing through the job transfer system, leads me to the conclusion that the relatively low percentages of blacks in career level positions during this period is more likely attributable to the dearth of qualified blacks and the work unit seniority system than to an impermissible disparate impact from DuPont's promotion practices.

The Government's principal reliance in this area, so far as statistical data are concerned, is on figures which show that the number of black upgradings and promotions for blacks was much higher among operatives, laborers and service workers than among technicians. This is not surprising, however, when one considers that until recently more blacks than whites have been employed in the operative, laborer and service worker categories, and alternatively more whites than blacks have been employed in the technician categories. The following table suggests that the percent-

**60.** The testimony of Margaret Anderson relied upon by plaintiff reflects not an unwillingness on the part of supervision to explain either the transfer procedure or the opportunities for promotion but rather a dissatisfaction on Ms. Anderson's part with the inability of the supervisor to give her all of the information she wanted. (Anderson F–132–134). I do not interpret her supervisor's shortcomings as evidence of discrimination against her because she was black.

**61.** Includes lab technicians, resource assistants, and testing instructors.

**62.** Includes maintenance technician, mechanical technician and power technician.

**63.** It is apparent that this fall off in black participation is attributable to a departure of blacks from office and clerical positions without their being replaced with blacks or whites.

**64.** Source: PX–54.

age of promotions and upgradings which went to blacks in these two groups compares favorably with the black populations of those groups:

| YEAR | BLACK TECH. AS A % OF TOTAL TECH.[65] | BLACK UPGRADINGS AND PROMOTIONS IN TECH. CATEGORY AS A % OF TOTAL UPGRADINGS AND PROMOTIONS IN THAT CATEGORY[66] | BLACK OPERATIVES, LABORERS, AND SERVICE WORKERS AS A % OF TOTAL O, L & S WORKERS[65] | BLACK O, L, S UPGRADINGS AND PROMOTION AS A % OF TOTAL O, L, S UPGRADINGS & PROMOTIONS[67] |
|---|---|---|---|---|
| 1967 | 1.4 | 1 | 77.7 | 95 |
| 1968 | 1.6 | 3 | 70.9 | 94.5 |
| 1969 | 3.8 | 8.3 | 73.3 | 85.3 |
| 1970 | 4.6 | 14 | 67.3 | 91.3 |
| 1971 | 5.3 | 4.2 | 76.1 | 33.3 |
| 1972 | 6.1 | 25 | 73.8 | 69.2 |
| 1973 | 6.3 | 17.7 | 42.4 | 37.5 |
| 1974 | 7.4 | 21.9 | 39.0 | 25.8 |

### 5. Individual instances of alleged discrimination.

Five of plaintiff's nine employee witnesses received promotions shortly after they passed the tests necessary to qualify for their new jobs.[68] Their complaint is not that they were denied an opportunity to transfer into a new job once they had passed the test, but rather that they were not apprised of the possibility of transfer until several years after they had entered defendant's employ. I have described their testimony earlier in this section. It does not persuade me of disparate impact in the post-Act period.

A sixth employee, Matthew Twyman, did not pass the lab technician test until sometime during the course of trial but nevertheless was transferred to a lab technician job through the Thirteen Minus Two program (Twyman F–46–48). I do not understand Mr. Twyman to be contending that he was discriminated against in transfer.

Margaret Anderson apparently bases her claims of discrimination in transfer on the fact that another employee who was white received a promotion although that employee had spent less time in the mail room than had Ms. Anderson. (Anderson F–108, 113). But the record reflects that Ms. Blood actually had been hired three months prior to Ms. Anderson and did not receive the promotion until the same day that Ms. Anderson received her promotion. (Garyantes R–154–155).[69]

Plaintiff claims that both Ingrid Anderson and Shelvia Johnson were discriminated against in promotion because whites were hired as laboratory technicians subsequent to the time they qualified and requested transfer to lab tech jobs. (Pl. Proposed Findings of Fact p. 117, ¶ 20). Ms. Ander-

**65.** Source DX–100.

**66.** Source PX–88. The comparison is not wholly valid because these figures include promotions *to* the technician category as well as *within* its ranks, but this is the most relevant data available.

**67.** Source PX–89.

**68.** Ernest Cale passed the clerical aptitude test on October 11, 1967. On November 6, 1967 he was transferred to the clerical job which he had requested. (Cale F–163–164, 178). Herbert L. Starks passed the processing technician test in 1973 and shortly thereafter was transferred to a processing technician job. (Starks T–36–37, 43). Walter Slaughter took and passed a laboratory technician test in July 1965 and in August of that year he was transferred to a lab tech job in the textile research laboratory. (Slaughter G–148–149; Lawson Q–128). Curtis Slaughter took and passed a lab technician test on July 8, 1965 and on August 23, 1965 he was transferred to a lab technician job. (Slaughter F–80; Lawson Q–127). Robert Cooper took and passed a laboratory technician test on April 28, 1965 and within a month has been transferred to a laboratory technician job. (Cooper G–82–83, 102; Lawson Q–135–136).

**69.** Although Ms. Anderson in her testimony pointed to the promotion of Joy Marta as another indication of discriminatory practices by DuPont, the Government represented to the Court that it was not relying on Ms. Marta's promotion as evidence of discrimination against Ms. Anderson.

son passed the lab tech test in 1972 and subsequently put in a job transfer request for a lab technician job on either the day or oscillating shift. (Anderson G–52; Rossan Q–109–110). No lab technician has been hired by DuPont for day work since Ms. Anderson filed the job transfer request, (Lawson Q–146), and Ms. Anderson herself turned down the opportunity to take an oscillating shift job in the textile research lab because, prior to the time of the offer, she had switched to day work and did not want to rearrange her schedule. (Anderson G–53–54).[70]

Ms. Anderson also charges that white employees with less seniority that she were given preference in transferring to day shift jobs in the chemical laboratory, part of the TRL work group. (G–64–65). William Walker, assistant to the operations superintendent at TRL, testified that Ms. Anderson did not receive the transfer she requested because the system employed in making this kind of transfer within the TRL work unit was to give the employee with the greatest seniority who is currently working on night shift the opportunity to switch to day work. I accept this testimony. At the time the day work positions were filled in the chem lab, Ms. Anderson was already working in a day work job. (Walker R–140–141).

Shelvia Johnson took and passed the lab technician test in June of 1972. (Johnson G–19). She has filed a transfer request for day or oscillating shift lab tech jobs under TRL's transfer system and under the site-wide transfer request system. (Johnson G–19–21). While there have been whites with less seniority than Ms. Johnson who have received transfers to lab tech positions, no one with less seniority than she has received a lab tech position for the shifts she indicated on her job transfer request forms that she would be interested in accepting. (Johnson G–21–22). See also Lawson Q–122.

## B. Movement To Above Career Level And Supervisory Positions.

### 1. The procedures.

Employees at DuPont who reach career level positions may be promoted either to "above career level" positions or to supervisory positions. There are written job descriptions and specifications for each of the positions in these categories. (Herbert O–58; Gray H–143; PX–43(a) and (b) ). Both the above career level and supervisory positions are filled through nomination procedures, but the job criteria and the procedures themselves are sufficiently different that they will be discussed separately.

A career level technician can be nominated for promotion to an above career level position by first, second, or third line supervision in a given work group. (Herbert O–48–52; Campbell S–27; Clement O–130). No single supervisor or other person has the sole responsibility for nomination. The final decision for promotion is made by the superintendent of the laboratory involved after consultation with all levels of supervision. (Antonio J–155; Herbert O–49; Campbell S–27; Clement O–130). Although the testimony with respect to promotions to above career level positions in non-technician areas, such as maintenance or accounting, is less specific, it appears that such positions are filled through a similar nomination process. (Garyantes R–153; Antonio J–155; Strange D–75–77).

DuPont utilizes its above career level employees to perform highly specialized and skilled tasks which vary depending on the particular work unit involved. (Antonio E–93; Herbert O–54–58; Strange D–75–76). The most important criteria relied upon for filling these jobs are job knowledge and experience in the particular work area. (PX–43a; Antonio J–155; Herbert O–55–57; Antonio J–155–156). Defendant also looks for initiative and originality. (Herbert O–55–56). Mere satisfactory performance in a career level position is not a sufficient qualification for promotion to

---

**70.** I find no basis in fact for Ms. Anderson's suspicions that DuPont waited until she had switched to day work to offer her a lab tech job on an oscillating shift in TRL.

above career level. There is substantial competition for these desirable jobs and the objective of the system is to find the best qualified career level employee for an above career level job.

The most important qualities DuPont looks for in supervisors are intelligence, leadership and training talent, a desire to be a supervisor, zeal, initiative and technical ability. (Gray H–139–141; Campbell S–19–22). The process of filling supervisory positions involves several steps including nomination, personal interviews, testing, and final approval by the site manager. (Gray H–144–148). It is not necessary that supervisors have worked in the particular job they are supervising. They must simply be able to understand how the particular jobs are performed. (Gray H–139).

Supervisors are expected to be able to function anywhere on the site. (Pease S–90; Gray H–153). This is why the process of supervisory selection is somewhat different from selection of above career level non-exempts. The latter will work in only the given unit and are not expected to transfer to any other position. (Strange P–36–37). The basis of the promotion to above career level is technical ability rather than ability to handle other people. (Gray H–150; Strange P–50; Herbert O–113–114).

The first step in promotion to supervisory positions is a nomination procedure. Any person on the exempt roll can nominate a person to be a supervisor, or an employee can initiate his own nomination. (Gray H–144–145; Strange P–46). A person's immediate supervisor does not have the sole or even predominant voice in determining a nomination. (Gray H–144–46; Pease S–83–87).

After nomination, the candidates go through a series of personal interviews by various levels of supervision, and in nearly all cases are interviewed by one or more persons at the superintendent level. Thus, every nominated employee has the opportunity to talk to several members of the administration about his or her desires and to demonstrate what his or her qualifications for the job are. (Gray H–146–147).

After the interviews, the nominated employees take a test, referred to as an "in-basket exercise". That test measures the ability of an employee to handle details of a first line supervisor's job. (Gray H–147–148). This test has been conceded by the Government to be job-related. (Testing Stipulation February 7, 1977). No employee may be promoted from a non-exempt to exempt status without the review and final approval of that promotion by the site manager. (Gray H–155).

It is true that defendant's procedures leave room for the exercise of subjective judgment in the evaluation of potential candidates for both above career level and supervisory jobs but this fact alone does not make them unlawful.[71] Indeed, it would not be feasible to eliminate subjective criteria from the selection process for jobs at these levels.[72] It is feasible to reduce the risk of disparate impact inherent in subjective criteria by the institution of procedures and standards which control and review the exercise of subjective judgment. This DuPont has done. There are written job de-

---

71. See, for example, *Nance v. Union Carbide Corporation, Consumer Prod. Div.*, 540 F.2d 718, 727 (4th Cir. 1976) (ability to work amicably with fellow employees—a valid criterion); *Levens v. General Services Administration*, 391 F.Supp. 35, 36 (W.D.Mo.1975), aff'd, 538 F.2d 332 (8th Cir. 1976) (the following were held to be "acceptable evaluation factors": (1) supervisory potential, (2) experience, and (3) job performance); *Roman v. ESB, Inc.*, 550 F.2d 1343, 1354 (4th Cir. 1976) (factors properly considered include: "performance on present job, willingness to accept responsibility, and dependability").

72. See *Rogers v. International Paper Co.*, 510 F.2d 1340, 1345 (8th Cir. 1975):

Greater possibilities for abuse, however, are inherent in subjective definitions of employment selection and promotion criteria. Yet they are not to be condemned as unlawful per se, for in all fairness to applicants and employers alike, decisions about hiring and promotion in supervisory and managerial jobs cannot realistically be made using objective standards alone.

scriptions. Employees are kept informed of their supervisor's evaluation of their performances and have ample opportunity to challenge those evaluations if they are dissatisfied. Moreover, any promotional decision must be approved in advance by several levels of supervision each of which can suggest or nominate a better qualified employee. (Gray H–166–169; Herbert O–51). And if there is any disagreement, the final decision is made by the site manager. (Herbert O–52). Any employee who feels aggrieved by a promotional decision may appeal to supervision (Herbert O–53–54), or may file a grievance with the industrial relations officer, who will appeal to the site manager on the employee's behalf. (Gray H–169; Strange D–104; Herbert O–53–54).

The only weakness which this Court perceives in defendant's procedures from an equal employment opportunity standpoint comes at the stage of identifying possible candidates for promotion. Notices of openings in these positions are not posted, and while an employee may express an interest in promotion to his supervisor, no record is kept of these requests for review by supervisory staff when openings subsequently occur. These practices dilute the protection afforded by the "self nomination" aspect of the procedure and hold the potential that racial bias or racially stereotyped thinking on the part of an individual supervisor may result in a qualified black being overlooked and not evaluated in the promotion process. I believe it highly unlikely, however, that blacks have in fact been overlooked in the promotion-evaluation process at these sites. I reach this conclusion for two reasons. First, the record demonstrates that second line supervisors have substantial contact with, and knowledge about, the career level employees in their units and that they are accessible to those employees when they have job problems or desires to discuss. Second, and most important, I am persuaded that all levels of defendant's supervision were aware that part of the performance upon which they themselves would be rated would be their results in developing, encouraging and advancing qualified blacks.[73] With management's having gotten this message across, I do not believe that potential black candidates for promotion were overlooked. The statistical data, hereafter discussed, does not suggest a contrary conclusion.

### 2. Above career level data.

Because above career level positions are highly specialized ones requiring specific job knowledge, it is impossible to make a meaningful comparison between the percentage of blacks in above career level positions in a given general job category (such as technicians, clericals or the like) and the percentage of blacks at career level positions in that category. Above career level technicians, for example, are promoted only in given work groups within a work unit. (C. Slaughter F–91; Antonio J–155; Sterling L–100–101). Thus, the appropriate labor pool for promotions to above career level positions in the yarn processing area of TRL, for example, would be the pool of career level technicians in that work area at the time of those promotions. The data on these individual pools have not been compiled. In addition, I do not even know how many promotions there were to above career level jobs during the post-Act period, either in total or by work area. It seems likely, however, that if these data were available, the number of observations of such promotions from pools which contained blacks would be so few that no statistically significant conclusions could be drawn. The best that can be done with the available data is to look at the experiences of those blacks who have attained career level positions in the various job categories and who, therefore, might have been apt candidates for promotion to above career level positions. A review of those job histories provides *no significant* evidence that blacks have been treated any differently than whites having similar amounts of relevant job experience.

As the Government points out, an analysis based on job experience cannot prove

---

73. *See,* for example, Pease S–69–60 and Campbell S–16.

the absence of disparate impact in promotion to above career level jobs since they are not awarded by seniority and since no minimum number of years of experience is a prerequisite to such promotions. The question, however, is not whether an absence of disparate impact has been proven. The question is whether it is more likely than not, based on all the evidence, that such an impact has existed. Given the background at these two sites and the highly segregated character of the work force on the effective date of Title VII, I believe a comparison of the relative employment experience of blacks at career level and of those employees above career level is more helpful in answering this question than a recital of numbers of blacks in above career level jobs during the post-Act period without the additional data necessary to determine the significance of those numbers.

(a) *Above career level technical positions.*

The first above career level technical positions are technical assistant, senior technician, industrial products leader, senior research assistant and senior technical assistant. The pool from which such promotions are made includes employees at the career level technical positions of laboratory technician, research assistant, and testing instructor as well as the above career level technical positions. While there is no requirement that one have a specific number of years of experience to be eligible for promotion, on the average, a technician has twelve to fifteen years of experience in that position before being promoted above career level to a technical assistant position. (Strange D–81).

It is undisputed that there has never been a black in an above career level technical position and plaintiff points to this fact as evidence of discrimination by DuPont in promotions to those positions. However,

the record reflects that between 1968 and 1976 there were only 44 blacks at Chestnut Run who were in career level technical positions and who, therefore, might have been candidates for promotion to technical assistant.[74] (*See* Appendix A to Def. Post-Trial Br.).[75] Of these, 10 were the product of defendant's Thirteen Minus Two program, and I do not understand plaintiff to contend that these employees, none of whom became laboratory technicians prior to 1972, were candidates for promotion to technical assistant. As of August 31, 1976 only one black, Samuel F. Holland, had worked as a laboratory technician for the average length of time technicians ordinarily work prior to their promotion above career level. Holland became a lab technician in the polymer products and resins group in October in 1961. Of the 26 above career level technicians in that group, 24 have at least four more years experience than Holland. While it is true that these are two white technical assistants with less experience than Holland, the record also reflects that there are at least eight white career level technicians in this group with from four months to over seven years more experience than Holland who also have not been promoted to a technical assistant position. This "pass over" of 8 whites with greater experience than Holland tends to rebut any inference of racial discrimination in promotions to above career level positions in this work group. (*See* Appendix F to Def. Post-Trial Br.).

Four other blacks, Curtis Slaughter, Robert Cooper, Alphonso Bostic and Edward Sutton were promoted to level 8 technical positions in the period from 1965 through 1967. As of August, 1976, these four had been career level technicians for nine to eleven years. Two of the four, Alphonso Bostic and Edward Sutton have been promoted to senior clerk A, which is a level 10

---

**74.** There were also black career level technicians at Christina Laboratory. But Christina has only one person in an above career level technical position (PX–56).

**75.** Not all of these 44 blacks at career level at Chestnut Run were on roll at the same time, so the number of such blacks at the time of any given promotion decision would be substantially smaller. As of August, 1976, for example, there were 27 black career level technicians at Chestnut Run.

position above technical assistant. (PX–46A). Curtis Slaughter testified at trial that he had no complaint about not being promoted to a technical assistant position. (F–74, F–92). Robert Cooper's supervisor testified that Cooper lacked the ability to operate and maintain his equipment and to problem solve necessary to qualify him for a promotion to a technical assistant. (Pease S–76–78).

Fourteen of the other black career level technicians were still employed at Chestnut Run as of August 18, 1976.[76] These 14 had experience as career level technicians ranging from eight and one-half years to one and one-half months as of August, 1976. The above career level technicians in each of these employee's work groups had greater laboratory experience than did the black employees. In addition, there were white career level technicians in these groups who had greater experience than the black career level technicians and who also had not been promoted to a technical assistant position or above. (*See* Appendices C–F to Def. Post-Trial Br.).

In light of this evidence, the absence of blacks in above career level technical positions does not persuade me that the employment practices and procedures utilized in making promotions to those positions have had a disparate impact upon blacks.[77]

#### (b) *Maintenance assistant.*

The maintenance assistant position is a promotional opportunity for maintenance technicians. Unlike the other above career level positions, the maintenance assistant is promoted on the basis of work unit seniority.[78] Plaintiff points to no black maintenance technician who was passed over for a maintenance assistant promotion. Although there have been only three black maintenance assistants between 1968 and 1976, this is not surprising in view of the fact that the number of maintenance assistants employed in any given year has averaged only 15, and in view of the fact that up until 1975 the pool of maintenance technicians was only around one to two percent black.

#### (c) *Above career level secretarial positions.*

Between 1968 and 1976 there were only four blacks in the career level, stenographer A, position. Thus, there were only four blacks eligible for promotion above career level to secretary C or above. (PX–54, PX–15C). Defendant employs a number of whites in the stenographer A position who have greater experience than the one black currently in that position and who have yet to receive a promotion to an above career level secretarial position.

#### (d) *Above career level clerical positions.*

The first above career level clerical position is intermediate clerk B, which is filled through promotion from the intermediate clerk C position and from the material checker position. (PX–15C). Between 1968 and 1976 there were 15 blacks in the material checker or intermediate clerk C position. Of these, 6 have been promoted to above career level and 4 others have transferred to technical positions. (*See* Appendix H to Def. Post-Trial Br.). The 5 remaining blacks are still employed with defendant in the accounting work unit. Of

---

76. One was located in the yarn processing group, three were located in the textile testing group, five in the elastomers group, four in the pigments group, and one in the polymer products and resins group. (*See* Appendices C–F to Def. Post-Trial Br.).

77. Lab technicians are also the source for promotions to industrial products leader. (PX–15B). All four industrial products leaders are in the industrial processing group of the textile research laboratory. (PX–56; PX–60B). The only two black career level technicians in this group are both Thirteen Minus Two participants. As noted above, I do not understand plaintiff to contend that any of the Thirteen Minus Two program participants are qualified at this point for promotion above career level. In any case, all four industrial products leaders in the industrial processing group have greater experience than these two black technicians. (PX–56).

78. PX–43A—position description for maintenance assistant position dated August 20, 1974.

these five, Donald F. Harris has the most clerical experience. He became a material checker on February 6, 1967. While there are three whites with less clerical experience than he who have been promoted to above career level clerical positions, there are also four whites who have more clerical experience than Mr. Harris who have not been promoted above career level. This pass-over of whites suggests that the failure to promote Mr. Harris is not attributable to the fact that he is black. No whites with less clerical experience than the other 4 blacks have been promoted to above career level clerical positions. And as in the case of Mr. Harris there are several whites with more experience than these four blacks who similarly have not been promoted to an above career level position.

I cannot conclude from the above that there has been any discrimination against blacks in promotions to above career level positions in any job category.

### 3. *Supervisor data.*

Defendant obtains virtually all of its first line supervisory staff by promotions from its own non-exempt roll. (Gray H–141–142; Strange D–13). Although not spelled out specifically during the course of the trial, it seems apparent from the nature of the supervisor's responsibilities that the labor pool looked to for supervisory candidates includes only those non-exempt employees in career level or above career level positions.[79]

The percentage of defendant's career level and above career level non-exempt employees who were black is summarized in this table for every year since 1969:

| YEAR END | % BLACK |
|---|---|
| 1969 | 5.1% |
| 1970 | 5.1% |
| 1971 | 4.8% |
| 1972 | 6.4% |
| 1973 | 7.8% |
| 1974 | 8.2% |
| 1975 | 8.7% |
| 1976 (8/31) | 9.0% |

The Government argues that when the relevant labor pool for supervisors is compared with black participation in supervisory positions at the end of 1968 and 1975, the inference of disparate impact is compelling. Reliable year end figures for 1968 are not available. The figures for year end 1969 and 1975 and for August 31, 1976 were 3% (4 of 134), 3.8% (5 of 132) and 4.7% (6 of 127). As I have earlier noted, however, any such comparison must be made with the recognition that year end populations of particular segments of the work force, particularly with respect to the more desirable jobs, reflect pre-Act hiring and promotion decisions and that those likely to be appropriate candidates for promotion to supervisory positions are people with at least several years of experience in career level or above positions. For these reasons, even with racially neutral promotion procedures, one would expect a substantial lag between a percentage rise in the relevant pool and a comparable percentage rise in the ranks of supervisors.

Here, as in the area of promotions and transfers to professional positions, I conclude that the most relevant data in the record is that reflecting movement into supervisory positions rather than static population figures. A comparison of year end rolls for the years 1969 to 1975 and the roll for August 31, 1976, shows that there were 58 new supervisors between December 31, 1969 and August 31, 1976, of which 5, or 8.6% were black.[80] A comparison of this figure with the black participation in all career level and above positions during the same period does not suggest a disparate impact upon blacks.[81]

**79.** I find no record support for the Government's view that the relevant pool is DuPont's total work force less its supervisory exempts.

**80.** As noted earlier in connection with professional positions, such a comparison does not reflect any people who may have come on roll as supervisors and left in the same year. It also may reflect a few supervisors who have been hired as opposed to promoted from the non-exempt ranks. Nevertheless, I conclude that such a comparison is the best available reflection of supervisory promotions.

**81.** By far the greatest number of promotions, 37 out of the 52, were to supervisory positions in operations. Four of those 37, or 10.8% went to blacks. The most likely labor pool for such

The Government argues, however, that, even if these figures indicate no disparate impact for the period 1970 to the present, DuPont has not rebutted its *prima facie* case of discrimination during the period from 1965 to 1969. There are no figures in the record, however, showing the black population of career level and above non-exempts employees during this period or suggesting the number of black and white promotions to supervisory positions during that time. All that can be said is that the black population of the relevant pool was probably smaller than in the subsequent period and that by 1968 there were at least 2 black supervisors. While the unavailability of this data in the record is, in large part at least, not the fault of the Government, the fact remains that the record provides no basis for an inference of disparate impact in the 1965 to 1969 period.

One of plaintiff's black employee witnesses, Curtis Slaughter, charged during his testimony that he was discriminated against by DuPont's failure to promote him to a supervisory position. However, the testimony also reflected that when Slaughter spoke to supervision concerning possibilities of promotion to supervisor they were very receptive. They gave him an opportunity at relief supervision and offered to nominate him in accordance with the normal company procedures for selecting supervisors. When told that no supervisory positions were immediately open, Slaughter's interest waned and he did not pursue the matter. (C. Slaughter F–93–96, S–146–147; Campbell S–13–16).

In sum, the evidence does not persuade me that DuPont's procedures with respect to promotion to supervisory positions have had a disparate impact upon blacks.

## VII. TRAINING.

In support of its contentions that defendant has discriminated with respect to training opportunities for blacks, the Government points to (1) the testimony of several employee witnesses who claim to have suffered such discrimination themselves, (2) defendant's failure to place blacks in craftsman jobs thereby denying them the opportunity to train for higher level craftsman positions and (3) the low participation rates of blacks in the tuition refund program.

### A. *Individual On-The-Job Training.*

Rudolph Black, who was made a lab technician in 1963, testified that he did encounter racial prejudice upon his transfer to his new work unit and that there are still several employees in that unit who to this day probably would refuse to train him because he is black. However, he also testified that within two weeks of his coming to that unit most of the employees evidenced no unwillingness to work with him or to train him and that his training supervisors bent over backwards to give him the instruction he needed. He does not feel that he was given any less training opportunities than were his white counterparts. (Black R–76–77, 111–114).

Walter Slaughter was hired by DuPont in 1963. He became a lab technician in 1965, but was transferred back to the Service work unit after a ninety day probationary period.[82] He testified that the reason he was unable to satisfactorily master the assigned operation was the absence of adequate instruction by the technician charged

---

promotions would appear to be the career level and above career level non-exempt technicians. From 1970 to 1976, blacks constituted 2% to 7.8% of this pool. The only other major area in which supervisory promotions occurred over this period was in engineering. Of the nine promotions in this area, none went to blacks. This is not surprising, however, when one takes into consideration the fact that from 1970 to 1974 the labor pool from which engineering supervisors were likely to be promoted contained from 0 to approximately 2% blacks and

that in 1975 and 1976 the pool was 5 to 6% black. Based on the job description for engineering supervisor (PX–43B) I have concluded that the relevant labor pool from which engineering supervisors were promoted included essentially the maintenance technicians, mechanical technicians, power technicians and maintenance assistants.

**82.** Subsequently, after returning from a tour of duty in the service, Mr. Slaughter became a laboratory technician in another laboratory.

with that responsibility. Whether that instruction was adequate or not need not be resolved. The record reflects that Mr. Slaughter was given special instruction by his first line supervisor and his area engineer and that this was not normal operating procedure. Accordingly, his experience in his initial lab assignment does not suggest that defendant's personnel procedures regarding training discriminated against him.

Robert Cooper is a black who was hired by DuPont in 1964. He became a lab technician in April or May of 1965. He testified that although he was qualified to do more, he was not originally given the opportunity to train on all of the machines in his work area and was not instructed thoroughly on how to perform tests on all the machines that he did run. While he acknowledged that he had ultimately been exposed to all of the operations in the area and now felt competent to undertake what he described as the constantly changing tasks required in his work unit, he maintained that his exposure and responsibilities had come more slowly than those of similarly situated whites. (Cooper G–97–100, 109–110, 112).

I credit Mr. Cooper's testimony that his opportunities to work with a variety of machines and tasks did not come as rapidly as to others with whom he was working. This does not persuade me, however, that defendant's training procedures had a disparate effect upon blacks. The lag may have been attributable to Mr. Cooper's performance in the tasks he was assigned or to a stereotyped image of blacks on the part of another employee. Even if it was the latter, however, this would not alone impose liability on the defendant. No personnel system can eradicate the possibility of racial bias. Its function is to reduce the opportunities for its operation and make correction when it does occur. The defendant's personnel system seems reasonably designed to accomplish these goals. Mr. Cooper testified, for example, that when he brought his concerns about not having been assigned to a particular machine to the attention of his supervisor, he was promptly given the opportunity to operate it.

If the evidence as a whole suggested that discrimination in the training of blacks was a frequent occurrence, the experience of these three men would, of course, be of more significance. But I do not conclude on this record that prejudice against, or indifference to blacks in connection with training has been a frequent occurrence on the two sites during the post-Act period.

## B. *Craftsmen Training.*

The Government's evidence does not show discrimination against blacks in terms of the training received by black craftsmen actually employed in the Maintenance work unit. It argues, however, (1) that blacks were denied craftsman training by their initial assignment to the Service work unit and their inability to transfer into craftsmen positions and (2) that DuPont discriminated prior to 1972 by not having a maintenance trainee program like the one subsequently instituted.

I have already found that defendant's job assignment procedures had no unjustified disparate impact during the post-Act period. From 1964 to 1974, blacks could secure assignment or transfer to the Maintenance work unit by passing the Entry Mechanic Test, a test which is conceded to have been valid. Blacks were actively sought out for these positions, a few were hired, and there is no evidence that any qualified black was not hired or transferred when a position was open.

With respect to the Government's first argument, principal reliance is placed on the fact that two black employees, Milton Gaymon and Thomas Campbell, who had mechanical experience prior to their employ by DuPont in 1954 and 1955, were initially assigned to the Service work unit and were never transferred to craftsman jobs. Their initial assignment was concededly the product of a racially discriminatory system. Their failure to wind up as craftsmen, however, appears to the Court to have been the result of their own preference. Mr. Campbell passed the clerical test in 1965 and moved to a clerical position. He thus knew

of the job transfer system and of the availability of testing in 1965 and apparently elected not to take the Entry Mechanics Test. Mr. Gaymon retired as a service driver in 1974. There is nothing in the record which suggests that he desired transfer to a craftsman position.

The Government's second argument is based on the concededly correct legal principle that even a validated testing requirement may violate Title VII, if there is an alternative selection procedure which will serve the employer's need substantially as well but which will have a lesser disparate impact upon blacks. The Government relies, for example, on *Crockett v. Green*, 388 F.Supp. 912 (E.D.Wis.1975), aff'd 534 F.2d 715 (7th Cir. 1976), where the court held that a "valid practical performance examination which . . . [would] adequately measure an applicant's skills", 388 F.Supp. at 920, would serve the employer's interests as well as its existing practice of requiring prior apprenticeship and experience and would have less of a disparate impact upon blacks.

The *Crockett* case and the principle for which it stands are inapposite here, however. DuPont instituted a practical performance test in 1964, and the alternative which the Government suggests is not a procedure for determining existing skills. The maintenance trainee program is designed to impart skills. It involves 36 to 48 months of training. It has assisted many blacks in acquiring skills which they might not otherwise have acquired[83] and is, accordingly, a substantial aid to blacks. But, I cannot hold that the absence of such a program prior to 1972 was a violation of Title VII. The Government has cited no

case, and the Court has found none, which suggests that Title VII imposes a duty to hire unskilled workers and train them, rather than hire appropriately skilled workers on a racially neutral basis, simply because the former alternative would have less of a disparate impact upon blacks.[84]

### C. *Tuition Refund Program.*

The tuition refund program originated in 1962 as a post graduate program restricted to college graduates. In March of 1966, the program was modified to permit persons with two years of company service or two years of college education to participate in the program. In May of 1973 both of these alternative requirements were dropped, and the program is now opened to all full time employees. The sole criterion remaining for determining eligibility for the program is a desire to upgrade current skills or to acquire new skills which are job-related. Since the initiation of the program there has been a pamphlet explaining its terms which has been distributed at the time of hire.[85] The tuition program is also included as a separate item on the Orientation Check List.

Plaintiff claims that blacks were not apprised of the existence of the tuition refund program and that this accounts for their low participation rate in the program. In fact, I find that employees, black and white, were informed of tuition refund programs and that the statistics do not demonstrate a significant under-representation of blacks in the tuition refund program. Between 1966 and 1976, 7.7% of the program's 338 participants were black.[86] From 1965 to

---

**83.** As of December 31, 1972, 66.7% of the program's participants were black. As of December 31, 1973, 34.6% were black and as of December 31, 1974, 36.0% were black. (PX–54).

**84.** The Maintenance Trainee Program was instituted in an effort to comply with the affirmative action requirements for government contractors under Executive Orders 10925 and 11246. These Orders not only require an employer to refrain from discriminatory employment practices, as does Title VII, but also im-

pose an obligation to take affirmative action to create new opportunities for minorities. *See, e. g., Mele v. United States Department of Justice*, 395 F.Supp. 592, 594–5 (D.N.J.1975), aff'd 532 F.2d 747 (3rd Cir. 1976). DuPont's compliance with these Orders is not in issue in the litigation.

**85.** DX–15A; Strange O–181.

**86.** DX–17; Strange O–185.

1974, blacks represented from 6.7% to 11.2% of DuPont's overall work force.[87]

## VIII. THE THIRTEEN MINUS TWO PROGRAM.

■ It is the Government's position that DuPont violated Title VII by not sooner initiating, and by discontinuing, the Thirteen Minus Two Program. The argument in its brief is the same as that advanced in connection with the maintenance trainee program. It is said that the Thirteen Minus Two Program offers an alternative to the validated Laboratory Technician test for the selection of lab techs which would have less of a disparate impact upon blacks.

The answer is the same here as in the case of the maintenance trainee program. The Thirteen Minus Two Program is an affirmative action training program designed, in part, to teach skills which the Laboratory Technician Test tests. If a program participant could pass the laboratory technician test at any time during the five year period of the course, for example, he or she would automatically become a lab tech and cease to be a participant. Thus, while the Thirteen Minus Two Program has benefited blacks and has increased the black participation in technician jobs, it is not an alternative selection device which DuPont was required to adopt or maintain under Title VII.

■ At oral argument, the Government's argument changed somewhat. It was not argued that Thirteen Minus Two was an alternative to the Laboratory Technician Test, but rather that it is necessary to make such a program available to incumbent blacks, by way of a supplement to defendant's current selection devices, in or-der to eradicate "the present effects of past discrimination". This is not a case, however, where a program requested by the government will provide training which the employer has previously given to whites but discriminatorily denied to blacks and which, accordingly, is necessary to place blacks in the same position they would have been but for the employer's discrimination. *See, e. g., Franks v. Bowman Transportation Company*, 495 F.2d 398 (5th Cir. 1974), *rev'd on other grounds*, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976). The training provided by the Thirteen Minus Two Program had never been provided to anyone on the site prior to 1968 and, accordingly, had not been discriminatorily denied to anyone. While it is true that test qualified lab techs have been given substantial on-the-job training since the initiation of the test in 1955, and that similar training is included as part of the Thirteen Minus Two Program,[88] it is clear that program taught skills which, prior to 1968, would have had to be acquired in high school or elsewhere.[89] Thus, to the extent the Thirteen Minus Two Program was intended to overcome present effects of past discrimination, it was not the effects of the *employer's* past discrimination which the program sought to remedy. While the Government has, at times, appeared to suggest that a Delaware employer has a duty to remedy a disparate impact of the public school system in Delaware on blacks, I do not understand this to be the Government's ultimate position. In any event, I do not believe Title VII imposes such a duty.

## IX. CONCLUSION.

The evidence presented in this case demonstrates that the effects of the past sins of

---

**87.** The only years for which the statistics are readily available.

**88.** This part of the Thirteen Minus Two training has been available throughout the post-Act period to any black who could pass the lab tech test. Accordingly, no remedial program is necessary now to eradicate the pre-Act denial of such training to qualified blacks hired prior to 1965.

**89.** The Thirteen Minus Two Program participants received special math and science skill tutoring. In addition, this program had different criteria than had ever been applied before and, no white had ever become a lab tech pursuant to these criteria. Thirteen Minus Two participants were accorded five years, rather than the usual three, to demonstrate the required competence, and "competence" for participants meant mastery of 50% of total area duties, as opposed to 70% to 90% for test qualified people.

our society against its black citizens are not easily eradicated and that some of those effects are still with us. In the early 60's, our society finally began to commit itself to the task of eliminating racial discrimination in employment. DuPont joined in that commitment. Years of systematic discrimination by DuPont, however, had left a substantial legacy: an image of DuPont in the black community as an employer of black janitors only, stereotyped concepts among many whites concerning the capabilities of blacks, distrust and animosity among many blacks, resignation among others, and, of course, a segregated work force. These factors, together with the effects of racial discrimination in education and other areas beyond the "gate", have made progress toward giving blacks a fair share of the jobs at all levels in DuPont's work force a slow process.

The persistent efforts of DuPont's management and the government agencies charged with equal employment opportunity responsibility, however, have produced significant results. During the first five years after the effective date of Title VII the percentage of black hires at the two sites involved in this case approximated the black percentage of the available labor pool. While black participation was greater in the unskilled and lower skilled positions, the evidence does not show a statistically significant disparity between black participation in jobs requiring greater skills and the best available estimates of the black portion of the pool qualified to perform them. By the early 70's the black percentage of applicants for employment and the percentage of those hired by DuPont who were black substantially exceeded the black percentage of the available labor pool. By 1976 the racial composition of DuPont's work force showed substantial black participation at all levels and in all work units of any significant size.

As the Government stresses, the ultimate goal of fair share participation at all employment levels has not yet been achieved. There are no blacks, for example, currently serving in above career level, non-exempt, technician jobs despite the fact that there are a substantial number of jobs in this category. But I do not attribute the short fall from the ultimate goal to employment practices which are in violation of Title VII. DuPont's employment practices throughout the post-Act period have been racially neutral in both concept and practice. In addition, they have been reasonably designed to guard against racially tainted decisions on the part of individual employees and, with the exception of the work unit seniority system, have operated to eliminate the effects of DuPont's past discrimination.

Of the factors which are responsible for the short fall from the ultimate goal, only one has been a result of DuPont's actions. The work unit seniority system is racially neutral in its operation and accords job security and advancement opportunities to blacks and whites alike on an equal basis. To some degree, however, it has operated in the post-Act period to perpetuate the effects of pre-1960 discrimination in job assignment. The victims of that discrimination who wished to advance have done so, but some would have been in a more desirable position today if the system had not existed. Nevertheless, it is clear that DuPont's work unit seniority system was not created for the purpose of discriminating against blacks and Congress has determined that, in these circumstances, employees with accumulated seniority should not be called upon to pay the price for an employer's pre-Act discrimination.

Accordingly, I am not persuaded that DuPont's employment practices in the post-Act period have violated Title VII.

## SUPPLEMENTAL OPINION

A reading of the Third Circuit's Opinion in *Rodriguez v. Taylor*, Nos. 76–2609, 76–2610, 76–2611, 569 F.2d 1231 (December 27, 1977), following the issuance of the Opinion in this case, has caused the Court to review its Opinion and the authorities pertaining to the allocation of the burden of proof in Title VII cases. That review has led me to the conclusion that the parties, and if there is to be an appeal, the Court of Appeals,

deserve further explication of this Court's views regarding allocation of the burden of persuasion and the basis for its holdings in this case. This conclusion occasions this Supplemental Opinion which will serve to amend the Court's conclusions of law and supplement its findings of fact.[1]

The original Opinion, in its general statement of the applicable legal standards, indicates that the introduction of a *prima facie* case by the Government places upon the employer the burden of going forward with evidence which tends to negate the inference of disparate impact, to explain any such impact by legitimate job related considerations, or to show that the plaintiff's statistics are a product of pre-Act policies only. It then goes on to suggest that, if the employer introduces evidence of any or all of these types, the ultimate burden of *persuasion* in all of these areas remains with the Government.[2] It is apparent, however, that the Opinion errs in not distinguishing between these alternative lines of defense in terms of the allocation of the burden of proof.

■ To the extent an employer defends on the theory that any substantial disparity between the sample of employment decisions and the appropriate pool is justified by the demands of his business, for example, the case law indicates that he has the burden of persuading the trier of fact, by a preponderance of the evidence, that this is, in fact, true.[3] *Griggs v. Duke Power Co.,* 401 U.S. 424, 432, 91 S.Ct. 849, 28 L.Ed.2d

158 (1971); *McDonnell Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *Ostapowicz v. Johnson Bronze Co.,* 541 F.2d 394 (3rd Cir. 1976); *Rodriguez v. Taylor, supra.* The inadvertent suggestion to the contrary in the Court's Opinion is thus misleading.

■ On the other hand, to the extent that the employer defends by introducing evidence tending to show that there is no significant disparity between the sample of employment decisions during the post-Act period and the relevant pool, I believe the ultimate question for the Court is whether a preponderance of all of the evidence indicates that there is such a disparity. Thus, as stated in the original Opinion, the Government has the burden of persuasion on whether there is a disparate impact from the challenged practices.

The weight of authority prior to *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), suggested that the Government starts with the burden of introducing a *prima facie* case—that is statistical and/or other evidence from which an inference of disparate impact can reasonably be drawn. Thereafter the employer can introduce evidence tending to show that the challenged practices have not had a substantial disparate impact. "Thus, both parties are afforded a full opportunity to prove or disprove the existence of a sub-

1. While Rule 52(b) speaks only of amending findings of fact and conclusions of law within ten days upon motion of a party, I conclude that a court is authorized to file amendments during that period *sua sponte*. 5A *Moore's Federal Practice* ¶ 52.11[1] (1977).

2. The Opinion also indicates that the burden of persuasion is with the Government to prove the existence of alternative employment procedures which would have less of a disparate impact, but would serve the employer's legitimate interest as well. The proper allocation of the burden of proof on this issue is not clear. *See Albemarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *but see* EEOC Guidelines, 29 C.F.R. § 1607.3(b) (1976); *Schlei and Grossman, Employment*

*Discrimination Law* (1976) pp. 1160–61. This issue need not be determined in this case, however, because it is reasonable at a minimum to require the Government to identify an alternative selection procedure which it maintains will meet these criteria. *Crockett v. Green,* 388 F.Supp. 912, 920 (E.D.Wis.1975), *aff'd,* 7 Cir., 534 F.2d 715. As indicated in the original Opinion, the Government has not identified an alternative *selection* procedure for craftsmen and laboratory technicians, the only jobs with respect to which it makes an "alternative procedure" argument.

3. The defendant in this case, of course, satisfied this burden with respect to its testing by introducing the stipulation of validation.

stantial disparate impact indicative of discrimination, with the ultimate burden of proof regarding this *prima facie* showing on the plaintiff". *Schlei and Grossman, Employment Discrimination Law* (1976) pp. 1159–60.

 I do not read the *Teamsters* case to suggest a contrary rule. The holding of that case is that, if the Government persuades the Court at the liability stage that an employer has in fact maintained a pattern and practice of purposeful discrimination, the employer, at the remedy stage, will have the burden of proving that decisions with respect to individual employees were made for some non-discriminatory reason and thus not a part of the pattern or practice. While the Opinion states that a *prima facie* case "shifts the burden to the employer to defeat the *prima facie* showing of a pattern or practice by demonstrating that the Government's proof is either inaccurate or insignificant", this language must be read together with the Court's declarations that the trial court's concern at the liability stage "is in deciding whether the Government has proved that the defendant has engaged in a pattern and practice of discriminatory conduct" and that the Government has the "burden . . . to demonstrate that unlawful discrimination has been a regular practice or policy followed by an employer or group of employers". In this context, this Court reads the "shifting of the burden" language as a reference to a shifting of the burden of going forward with evidence, rather than to a shifting of the burden of persuasion.

*Rodriguez* suggests that, in a disparate treatment case, introduction of evidence supporting a finding of each of the four factors listed in the *McDonnell Douglas* case as constituting a *prima facie* case, shifts the burden of persuasion to the employer to show that the decision with respect to the plaintiff was made for some non-discriminatory reason. While *Rodriguez* and the cases upon which it relies are disparate treatment cases and pertain to the allocation of the burden of persuasion with reference to the issue of an employer's

intent, they may suggest that a similar rule will be applied in disparate impact cases in this Circuit with respect to the issue of whether the challenged practice has had a substantial disparate impact. For this reason, it is in the interest of the efficient administration of justice to indicate that, while the original Opinion of this Court reflects the view of burden allocation articulated above, its resolution of the merits of this case does not rest upon that view.

This case has been fully litigated and the record contains relevant evidence supporting both sides of most of the disputed issues. In such circumstances, it is, of course, unusual to find a case where the "scales" are evenly balanced and the ultimate result is dictated by how the burden of persuasion is allocated. As the following summary of the Court's findings and conclusions indicates, this is not one of those rare cases.

### 1. *Initial Job Assignment of Non-Exempts.*

The Government offered evidence of the black percentage of the total population in a proposed hiring area and of the racial breakdown of technical, clerical, craftsmen and service workers, respectively at the two sites. DuPont countered with evidence tending to show (1) that the work force in the Wilmington SMSA was a more reliable indicator of the available pool than was the Government's proposed pool, (2) that the black percentage of the labor force qualified to serve as laboratory technicians, craftsmen and certain clerical workers was sufficiently small that no inference of disparate impact could be drawn from the Government's evidence, and (3) that, in any event, blacks had equal accessibility to the validated testing and, accordingly, that any significant disparity was justified by the requirements of the jobs for which testing was required.

The Court found that the work force of the Wilmington SMSA was the best indicator of the available labor pool and that there was no significant disparity between the black population of that pool and the black populations of processing and testing

technicians and of Level 2 and 3 clerical workers during the post-Act period. The Court further concluded from the evidence that there was no statistically significant disparity between the black percentage of those serving as laboratory technicians and the available pool of people qualified to hold those positions. With respect to stenographers and craftsmen the Court found there was sufficient evidence to permit an inference of disparate impact from defendant's job assignment procedures but declined to draw that inference because it was persuaded by the defendant's evidence that blacks had equal access to testing during the post-Act period. Since the defendant had demonstrated to the satisfaction of the Government before trial that its testing was, in fact, related to the requirements of the technician, clerical and maintenance jobs, the Court found that defendant's job assignment procedures had not had an unjustified disparate impact upon blacks.

### 2. Initial Assignment of Exempts.

In this area, the Government relied upon evidence showing a disparity between the racial composition of DuPont's professionals and the racial composition of the census classification of "professional, technical and kindred workers" in the Wilmington and Philadelphia SMSA's combined. DuPont countered with evidence tending to show that there was no statistically significant disparity between the black percentage of those serving as professionals at the two sites and the black percentage of the national pool for the kinds of professionals actually employed by DuPont. The Court accepted DuPont's contention with respect to the relevant pool and found no statistically significant disparity between the black population of that pool and the black population among the total ranks of DuPont's professionals. Moreover, the Court was persuaded by the evidence that the black population among those *selected* to be professionals at the two sites during the post-Act period compared favorably with the black population of the relevant pool of professionals.

### 3. Movement To Career Level.

The Government introduced evidence showing (1) that the work unit seniority system tends to perpetuate the effects of past discrimination, (2) that defendant's transfer and promotion procedures left room for the operation of subjective judgment, and (3) that job openings were not posted. The Court found that while the work unit seniority system did have the effect ascribed to it by the Government, it did not violate Title VII because of the provisions of 42 U.S.C. § 2000e–2(h). The Court also found that the transfer and promotion processes sufficiently insulated DuPont's employees from bias on the part of individual members of supervision. Finally, the Court concluded that blacks were informed of the procedures and opportunities for advancement and that those who qualified by testing and by seniority were promoted as positions became available. The relatively low participation of blacks in career level jobs was found to reflect the dearth of qualified blacks during the post-Act period and the effect of the work unit seniority system. Finally, the Court found that the percentage of promotions and upgradings going to blacks compared favorably with the percentage of blacks who were in a position to receive those promotions and upgradings. Based on all of the relevant evidence and the applicable law, the Court held that the defendant's employment practices in this area did not violate Title VII.

### 4. Movement Above Career Level.

The Government proved that there has never been a black in an above career level technical position and that there have been very few blacks who have been promoted to other above career level jobs. As the Court indicated in its original Opinion, it believes that the burden is on the Government to prove a significant disparity between the black percentage of those promoted to above career level jobs and the black percentage of the pool from which people are selected for promotion. It has not shown the number of people promoted during the

post-Act period or the racial composition of the populations from which they came. What it has shown is that there are few above career level blacks and that there were some blacks in the pools from which they came. Because of the insufficient information and the small size of the samples, the Court concluded that no reliable inference could be drawn from the data relied upon by the Government. But the Court's ultimate conclusion need not rest upon a finding that the Government failed to present a *prima facie* case or a holding that the Government's evidence was insufficient to shift the burden to DuPont to persuade the Court that the small number of blacks in the above career level jobs was attributable to pre-Act discrimination. Based upon the evidence reviewed in the original Opinion concerning the procedures themselves and the relative experience of the workers in each unit in which blacks were a part of the pool, I have concluded that the absence of more blacks in the above career level ranks is more likely attributable to pre-Act discrimination than to discriminatory promotion procedures.

### 5. *Movement To Supervisory Status.*

In this area, the Court found that the most relevant statistics offered by the Government were those showing the black population of the pool of career level and above career level employees, and the black population of the supervisory ranks at year end 1969, 1975, and August 31, 1976. The Court concluded, however, that statistics offered by DuPont showing the racial composition of those moving into supervisory positions during the 1970 to 1976 period constituted the best available evidence on the issue. of whether or not there has been a disparate impact from defendant's procedures for selecting supervisors. The promotions of blacks during that period compared favorably with the black population of the pool. The Court also noted that the Government had not tendered statistics from which a rational inference of disparate impact in the 1965–69 period could be drawn and, accordingly, had not established a *prima facie* case for that period. As the

Court further noted, however, 4, or 3%, of the 134 supervisors at the end of 1969 were black. The black portion of the career level and above work force at that point had only risen to 5.1%. The Court further found that in most instances career level and above employees have several years of experience and evaluation in those jobs before being able to successfully compete for supervisory openings. Based on these findings and the results produced by the same promotional procedures in the 1970 to 1976 period, I find it more likely than not that those procedures did not have a disparate impact upon blacks in the 1965 to 1969 period.

### 6. *Training And The Thirteen Minus Two Program.*

In this area, the Court concluded that the Maintenance Trainee Program and the Thirteen Minus Two Program were training programs rather than alternative selection procedures and that the defendant was entitled to hire skilled workers on a racially neutral basis or to hire unskilled workers and train them on a racially neutral basis. Since the regular testing was validated and since there was no discrimination against blacks in admission to these special training programs, the Court held that defendant's procedures for selecting laboratory technicians and craftsmen during the post-Act period did not violate Title VII.

With respect to the Tuition Refund Program, the evidence showed no statistically significant disparity between the black participation and the black population of defendant's overall work force. Finally, with respect to the evidence of three individual situations claimed to show discrimination in on-the-job training, the Court concluded that defendant's employment practices were reasonably designed to reduce the risk of racially discriminatory practices by individual employees and that discrimination in this area was not a frequent occurrence during the post-Act period.

In conclusion, allocation of the burden of persuasion has not played a determinative

role in this Court's resolution of any of the issues before it. The preponderance of the evidence indicates that the defendant's employment and personnel practices during the post-Act period did not violate Title VII.[4]

4. The final sentence of footnote 25 of the original Opinion is in error. It is amended to read: The Chestnut Run site is not in the City of Wilmington and the Commission has since abandoned this contention.